**AMTORG TRADING CORP. v. MIEHLE PRINTING PRESS & MFG. CO. (OF DELAWARE).**

No. 210, Docket 22620.

United States Court of Appeals Second Circuit.

Argued April 10, 1953.

Decided July 22, 1953.

Paul L. Ross, New York City (Wolf, Popper, Ross, Wolf & Jones and Benjamin Spiegel, all of New York City, on the brief), for plaintiff-appellant.

William B. Moore, New York City (McLaughlin, Russell, Bullock & Lark, New York City, on the brief), for defendant-appellee.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

On August 1, 1947, plaintiff, Amtorg Trading Corporation, the Soviet purchasing agency in New York, entered into a written contract with defendant's predecessor in interest for the purchase of 30 printing presses, f.o.b. Milwaukee, for the avowed purpose of exporting them to Russia. The presses, designed for a special purpose—printing of currency—were to be manufactured according to specifications by the press manufacturing company to whose interests the present defendant has succeeded under circumstances not here pertinent.[1] The contract called for the delivery of 10 presses by February, 1948, 10 more by March, 1948, and the final 10 in April, 1948. The total price was $352,035.90, of which a down payment of 25 per cent or $88,008.97 was required and paid. The first lot of 10 presses was delivered in February, 1948, and Amtorg duly paid for the balance due upon it over the 25 per cent advance credited to that group. There remained a prepayment toward the remaining 20 presses of $59,946.47 still held by defendant, although delivery of these presses has never been made because of circumstances now to be related.

On March 1, 1948, there became effective regulations, 13 Fed.Reg. 1120–22, promulgated in January, 1948, of the Department of Commerce's Office of International Trade pursuant to the Export Control Law of 1940, 54 Stat. 714, 50 U.S.C.Appendix, § 701, as amended, barring further export of these goods to Russia unless an export license therefor was obtained. While the parties applied for a license, it was ultimately denied in June. Amtorg refused tender of the remaining 20 presses; Miehle brought suit in the New York Supreme Court for the purchase price, less the prepayment of $59,946.47; and Amtorg counterclaimed for return of this latter sum. The state court granted summary judgment to Miehle and this was affirmed on appeal. Miehle Printing Press & Mfg. Co. v. Am-

1. In February, 1948, defendant, Miehle Printing Press & Manufacturing Company (of Delaware), took over the business of Miehle Printing Press & Manufacturing Company (of Illinois), which filed a certificate of surrender of authority with the Secretary of State of the State of New York.

torg Trading Corp., 275 App.Div. 748, 88 N.Y.S.2d 271. Before the decision of the appellate division came down, however, Miehle had sold the presses to the United States Bureau of Engraving and Printing for a price which was $18,765 more than its contract price to Amtorg. Miehle then obtained leave to discontinue without prejudice its suit against Amtorg, whose motion for leave to file a supplemental answer was denied without prejudice—since it could assert its rights in a new action—and again the decision was affirmed by the appellate division. Miehle Printing Press & Mfg. Co. v. Amtorg Trading Corp., 278 App.Div. 682, 103 N.Y.S.2d 493.

Amtorg thereupon brought this present action in the court below basing the jurisdiction of the court both on a federal question allegedly arising under the export regulations and upon the diverse citizenship of the parties. The court below rejected the former, but sustained the latter ground, which of course is adequate to support the suit, since plaintiff and defendant are corporations of New York and Delaware respectively. The complaint set forth six claims or "causes of action," each in various ways laying claim to the down payment alone or together with the $18,765 profit. The court, construing New York law, held that plaintiff as a buyer in default was not entitled to recover and hence denied its motion for summary judgment and granted that of defendant. D.C.S.D.N.Y., 108 F.Supp. 170. On this appeal Amtorg challenges that decision and seeks summary judgment in its favor, pressing only three of its claims: the first, which seeks return of the prepayment on the theory that the federal export restrictions frustrated the basic purpose of the contract and thus terminated it; the second, which demands both the prepayment and the $18,765 profit on resale to avoid unjust enrichment of the defendant, even if the federal regulation did not excuse plaintiff's nonperformance; and the sixth, which seeks return of the prepayment because its retention by defendant would constitute "an unjust and inequitable forfeiture" and "impose an unconscionable penalty" on it.

On the first claim, frustration of the contract, the New York law seems rather clearly against the plaintiff. See Bardons & Oliver, Inc., v. Amtorg Trading Corp., 123 N.Y.S.2d 633, affirmed 275 App. Div. 748, 88 N.Y.S.2d 272, affirmed 301 N.Y. 622, 93 N.E.2d 915, a like claim against Amtorg by another manufacturer; also Pierson & Co. v. Mitsui & Co., 111 Misc. 388, 181 N.Y.S. 273, holding that there is no impossibility of performance where delivery to the buyer is to occur in this country. There is nothing to the contrary in the federal cases which deal only with actual impossibility. Pacific Trading Co. v. Mouton Rice Milling Co., 8 Cir., 184 F.2d 141; Patch v. Solar Corp., 7 Cir., 149 F.2d 558, certiorari denied 326 U.S. 741, 66 S.Ct. 53, 90 L.Ed. 442. And the rule is accepted as thus stated in 6 Corbin on Contracts 354 (1951). Hence we need not decide at this point whether federal or state law governs; in any event the claim of frustration must be denied.

But on the claims for restitution for unjust enrichment, most inclusively stated in the second "cause of action," we reach an issue of great interest and importance. The early view that a contract defaulter is barred from all recovery, even for a manifest benefit conferred, has called forth criticisms of telling force; one recalls the famous early decision of Parker, J., in Britton v. Turner, 1834, 6 N.H. 481, 26 Am.Dec. 713, allowing a *quantum meruit* recovery on a contract of personal service where the plaintiff was in default. The principle that a contracting party in default may nevertheless recover the amount of actual benefit conferred on the opposing party has been strongly favored by Professor Corbin, see 5 Corbin on Contracts § 1122 et seq. (1951); and he, as Reporter of this part of the Contracts Restatement, engaged in fruitful collaboration with Judge Cardozo in the drafting of the famous § 357 of that restatement in language suggested by the judge (5 Corbin on Contracts § 1135, n. 1) to provide for such recovery. The provision is properly restricted; the plaintiff's nonperformance is not to be "wilful and deliberate"; and plaintiff cannot recover mere

earnest money or payment which the contract provides may be retained and which "is not so greatly in excess of the defendant's harm that the provision is rejected as imposing a penalty." As Corbin points out, op. cit. supra, many of the cases which state the rule more restrictively often find means of allowing recovery, while others are cases where restitution would be actually unfair or no real benefit is proven. See Harris v. The Cecil N. Bean, 2 Cir., 197 F.2d 919, 922; also Corbin, The Right of A Defaulting Vendee to the Restitution of Instalments Paid, 40 Yale L.J. 1013 (1931); Goble, Right of A Defaulting Plaintiff, 22 Ill.L.Rev. 315 (1927); Thurston, Recent Developments in Restitution, 1940–1947, 45 Mich.L.Rev. 935, 950–953 (1947); and the notable reports of the New York Law Revision Commission cited below.

In the federal courts the position of the Restatement has been accepted. See Schwasnick v. Blandin, 2 Cir., 65 F.2d 354, 357; and Michigan Yacht & Power Co. v. Busch, 6 Cir., 143 F. 929. In New York at an early date the stricter rule obtained; and the case of Lawrence v. Miller, 1881, 86 N.Y. 131, refusing recovery to a defaulting vendee of land, has been often cited as a precedent for, among others, contracts for the sale of goods. So in the New York Annotations to the Restatement of Contracts it is said that § 357 is more liberal than the New York rule. But there is no modern discussion in any opinion in the Court of Appeals; thus we lack any real analysis of the possible effect of Judge Cardozo's draft upon his own court. There have been, however, several trends away from this harsh rule in situations deemed exceptional which have finally led to recent legislation overturning it. The leader in this movement has been the Law Revision Commission, whose two monographic essays proposing the legislation adopted in 1952 give a complete analysis of the problem, with particular attention to the New York cases: Acts, Recommendation and Study relating to Recovery for Benefits Conferred by Party in Default, N.Y. Law Revision Com'n, 1942 Report, Recommendations and Studies 179–243; Act, Recommendation and Study relating to the Right of a Buyer

of Goods to Restitution for Benefits Conferred Under a Contract of Sale on Which He Has Defaulted, N.Y. Law Revision Com'n, 1952 Leg.Doc. No. 65(C), 1–19.

Among the "Mitigating Doctrines" which the Commission finds have been applied in New York, see 1942 Report 27–31, 1952 Leg. Doc. No. 65(C), 12–13, are those of "substantial performance" used notably in the case of building and construction contracts and "severability" used primarily in employment contracts. So N.Y. Labor Law, McK.Consol.Laws, § 196 requires payment of wages every six days, while N.Y. Personal Property Law, McK.Consol.Laws, § 125(1)—the Uniform Sales Act § 44—allows recovery for part performance by a defaulting *vendor* for goods retained by the vendee, and N.Y. Personal Property Law §§ 79, 80, 80–a, allows a defaulting buyer under a conditional sales contract any surplus on a compulsory or optional resale by the seller. Another ground relied on is that money advanced by a buyer or lessee may be treated, in the absence of definite specification, as merely security for the ultimate payment, rather than as a down payment, thus leaving any excess not required as security refundable. See cases such as Becker v. Rothschild, Sup., 141 N.Y.S. 528; Mernagh v. Nichols, 132 App. Div. 509, 118 N.Y.S. 59; Cohen v. Champagne, Sup., 183 N.Y.S. 76; Petito v. Aiello, 181 Misc. 371, 47 N.Y.S.2d 447; and cases collected and the rule stated in 11 A.L.R.2d 701, 716; see also Horgan & Slattery v. City of New York, 114 App.Div. 555, 100 N.Y.S. 68. This attempted distinction between part performance and a security deposit seems as impractical and unjustified as the Law Revision Commission states it to be. 1942 Report 61–63, 1952 Leg.Doc. No. 65(C), 13–16.

Because of the harshness of the doctrine, including the palpable discrimination between the defaulting seller and buyer, and between the latter and the conditional vendee, the Commission proposed the amendment to the Sales Act which was adopted, effective September 1, 1952, as N.Y. Personal Property Law § 145–a. By its terms the Act does not apply to any contract made before its effective date. It allows

the buyer in default restitution of the amount by which the payments made or the reasonable value of the goods exceeds either an agreed-upon sum in the contract which constitutes a reasonable liquidation in advance of the seller's anticipated damages or, in the absence of such a clause, 20 per cent of the value of the total performance for which the buyer is obligated under the contract. The latter provision constitutes "in effect a statutory liquidated damage provision to be used only as an offset." 1952 Leg.Doc. No. 65(C), 6.

Such is the developing New York law on this interesting issue. Where a changing public policy is so manifest, it would seem that the Court of Appeals of New York might well give some effect to it in cases not as yet regulated by the new statute. It is one of the appreciated defects of the famous Erie-Tompkins doctrine that it suggests a rigidity in the statement of state law by federal judges which is foreign to the habits and customs of their state colleagues, as well as to the development of the law generally. A statement by us of New York law in terms of the old cases might turn out to be more hazardous a course than boldly to try to look into the womb of time, however much that course may be decried. See L. Hand, J., dissenting in Spector Motor Service v. Walsh, 2 Cir., 139 F.2d 809, 822, vacated 323 U.S. 101, 65 S.Ct. 152, 89 L. Ed. 101.

Under the circumstances here present, however, we do not think we need grasp the nettles of this dilemma. In the Foreign Aid Appropriations Act, 1949, approved June 28, 1948, P.L. 793, 80th Cong., 2d Sess., c. 685, § 204, 62 Stat. 1054, at page 1059, U.S.Code Cong.Serv.1948, pp. 744, 745, Congress provided:

"Whenever an export license for a commodity, the production or shipment of which to a nonparticipating country was contracted for in good faith prior to March 1, 1948, is denied or cannot be obtained under section 6 of the Act of July 2, 1940 (54 Stat. 714), as amended, the Administrator shall provide for the procurement of such commodity to transfer to a participating country in accordance with the requirements of such country, at not less than the contract price of such commodity to the producer or exporter, as the case may be, including any cost incurred in converting the commodity to meet the requirements of the participating country."

In its complaint, plaintiff alleges that defendant's profitable sale to the United States Bureau of Engraving and Printing was made by virtue of the relief here provided, while defendant counters that the statute had no bearing on the sale nor did the Administrator participate. But we do not see that this issue of fact need be resolved for our present purposes. What we are interested in is whether Congress has set forth, by implication or otherwise, a theory of contract law which in this localized and particular situation makes application of the earlier assumed New York law impracticable or improper. And this we think is the case.

We may perhaps assume that the primary object of congressional concern is the American producer. So it is planned to safeguard him from loss by the precipitate operation of the export license system before he has adjusted his business to it. But significantly the Act is not so limited. In terms it is also extended to an "exporter." Surely there will be many cases where a producer sells to an exporter who is amenable to process in this country and who, under the existing law of frustration, is not entitled to repudiate his contract. It seems clear that the benefit of this remedy should be extended also to such an exporter by lowering the technical bars to contract recovery where the producer has already directly availed himself of the congressional relief. The Act, construed as the defendant would have it, would mean that Congress had provided a double recovery for any producer fortunate enough to deal with a purchaser suable and financially responsible. Nothing in the Act suggests such a result; the developing common law of the country indicates a contrary trend; and the result is not a necessary one under the precedents True, the plaintiff may not be technically an exporter (though perhaps it is). At any rate it is an American corporation trans-

shipping goods abroad which is suddenly caught in the operation of the export license system. Hence it should not be denied the intended remedial benefits under the Act after the producer has been wholly recompensed.

Under the precedents it is clear that the Erie-Tompkins principle of respect for state law yields to overriding national policy and law. The outstanding case is Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, holding checks issued by the United States subject to a national law, even though no act of Congress so provided. The same principle was likewise expounded and applied in National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383. In United States v. Standard Oil Co. of Cal., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, subrogation of the United States over against a person injuring a soldier was held to be a matter of national, not of state, law, even though Congress had not spoken. Here, however, we have outspoken acts of the legislative body. Actually we have already recognized the Export Control regulations as setting a rule of national policy overriding New York contract law. Mitchell v. Flintkote Co., 2 Cir., 185 F.2d 1008, certiorari denied 341 U.S. 931, 71 S.Ct. 804, 95 L.Ed. 1361. See also cases cited in Exceptions to Erie v. Tompkins: The Survival of Federal Common Law, 59 Harv.L.Rev. 966 (1946), and Clark, State Law in the Federal Courts, 55 Yale L.J. 267, 284, 285 (1946).

The authorities therefore seem ample to justify giving effect to the 1948 relief legislation in the manner that must have been intended without the countervailing trend represented by what appears to be the current New York law. Plaintiff is therefore entitled to restitution of its payments beyond and above any injury suffered by defendant. This would not include the additional profit on resale obtained by defendant; no reason is apparent why defendant should not have the advantage it has been able to reap by this fortunate and frugal act. It appears further that defendant by counterclaim asserted certain offsets by way of expenses on its resale. If actually its expenses did eat up its apparent profits, it may deduct the amount of the excess from the prepayment before its refunding; but these should be duly proven expenses and not manufactured items, such as a claim for a commission on the resale to the defendant. Defendant cannot claim payment for its services rendered in its duty to mitigate damages. The case must be remanded for the determination of this issue and for entry of a judgment for plaintiff for refund of the prepayment, subject to deduction of any expenses proven by defendant if and only so far as they may exceed its profit of $18,765.

Reversed and remanded.