Warren S. MARTIN, Appellee,

v.

MORSE BOULGER DESTRUCTOR
COMPANY, Appellant.

No. 99, Docket 23061.

United States Court of Appeals,
Second Circuit.

Argued Jan. 10, 1955.

Decided March 14, 1955.

Herman Englander, New York City (Englander & Englander, New York City, on the brief), for appellant.

Frederick W. Newton, New York City (Wait, Wilson, Newton & Campbell, New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

CLARK, Chief Judge.

Defendant appeals from a judgment awarding plaintiff patent royalties pursuant to contract, and dismissing its counterclaim for a declaratory judgment of outright ownership of the patents involved, covering multiple hearth furnaces. The basic disagreement between the parties remaining on this appeal[1] concerns defendant's obligation to pay additional royalties for the year 1950.

The legal rights of the parties are governed by two contracts entered into on February 13, 1946. On that date plaintiff obtained ownership, contingent upon payment of $21,000, of two different sets of patents from a former employer, The Underpinning & Foundation Co. Inc. The set here involved consisted of plaintiff's own patents, known as the Martin patents, which had only been licensed to Underpinning. Another group of Underpinning's own patents are not here in issue. All plaintiff's rights in the Underpinning contract were immediately assigned to defendant, who assumed the financial obligation contained therein. It is the Morse contract containing this assignment with which we are directly concerned here. It provided for absolute assignment of the Underpinning patents and for licensing of the Martin patents. Plaintiff was also obligated to devote his personal services to the exploitation of these patents for the mutual benefit of both parties and was to receive compensation of annual minimum royalties of $5,000 and additional royalties as earned according to the contractual scale.

In 1950, Morse Boulger, the defendant, contracted for two projects which the plaintiff claimed entitled him to $1,500 beyond the minimum royalties which he had been paid. He made a demand upon an officer of defendant, which demand was refused. Thereupon, relying on a provision in the contract that default in royalty payments would result in cancellation of the license agreement, he demanded their reassignment to him. When this also was refused, he stopped working for defendant. It is on this cessation of personal services that defendant's counterclaim relies, for another clause of the Morse contract provided that such a situation, unless the result of an arbitration award, would result in forfeiture of the patents to defendant. Judge Byers found that plaintiff's royalty computation was correct and that his subsequent refusal to continue in defendant's employ was rightful. Therefore he dismissed the counterclaim and awarded plaintiff $1,500 for 1950 and, in addition, minimum royalties

---

[1]. Originally plaintiff sued also for rescission of the contract because of defendant's allegedly inadequate assistance in publicizing the patents, complaining principally of its failure to provide pilot plants for demonstration purposes. But he has not appealed from the dismissal of this claim below for failure of proof.

since that time, because defendant retained use of the patents.

The royalty computation for 1950 is based on two projects: one a furnace for Merck & Co., Inc., and the other a garbage disposal plant for the City of Saginaw, Michigan. To the allowance of royalties on each of these, defendant raises various objections, any one of which, if accepted, would defeat plaintiff's right to more than minimum royalties.

■ The issue on the Merck project turns on whether that furnace is an incinerator or a calcinator. Under the contract, royalty payments for an incinerator are calculated on the tonnage of input materials, while royalties on a calcinator depend on output tonnage. Since output is substantially less than input, acceptance of the smaller basis would not bring plaintiff above the minimum for which he had already been compensated. Judge Byers referred the question to a special master, who took evidence and eventually found that the furnace is an incinerator. There is nothing to demonstrate that this conclusion does injustice to the evidence; and we shall accept it as certainly not clearly erroneous, as did the trial judge.

■ The Saginaw installation is conceded by both parties to have been a multiple hearth furnace for sewage disposal. Defendant argues first that the contract of sale of the City of Saginaw was not irrevocably accepted by the city until 1951 (and thus would not give rise to royalties until 1952); and second that, under an exclusion clause in the contract between it and plaintiff, no royalties whatsoever are payable on sewage projects.

The sale to the City of Saginaw was the result of an award after competitive bidding, as prescribed by § 33 of the Saginaw City Charter. The advertisement for bids prescribed that no proposals could be withdrawn by any bidder for a period of thirty days after the scheduled closing time for the acceptance of bids, which was November 28, 1950. Defendant was awarded the contract early in December, and was so notified, for it signed a contract dated December 12 and procured a surety performance bond, also dated December 12, which specifically recited that such an award had been made. In accordance with the requirements of a municipal ordinance,[2] the City Council approved the contract on December 26, 1950. Thus concededly all the substantial and potently disputable steps of the negotiation were completed with finality in 1950; the only contractual step in any way attributable to 1951 was the mailing of the contract back to defendant on January 5.

It is obvious that this is a technical objection, newly thought up by the defendant. Neither of the actual parties intended to or did at any time question with each other the binding effect of this contract. The question is raised only to prejudice the rights of a third person. It is clear that defendant as a bidder was not left as a free agent to press or withdraw its offer at will. The offer had to remain alive for thirty days and, if accepted by the City in that period, became a binding contract without regard to what the offeror might do. How that assent was to be signalized is not made explicit; it is clear, however, that a formal contract with supporting bond was to be approved by the City's legislative body, the City Council, which obviously must act openly and publicly by formal vote. It would seem likely that such notorious act would form the contract and that no under city official thereafter could modify or nullify it by ministerial action or nonaction. Such

2. Section 202.4 of Chapter 3 of the Saginaw Administrative Code provides: "Where satisfactory bids are received, the contract shall be awarded by the Purchasing Committee to the lowest and best bidder, subject to approval of the contract and bond by the Council." There is thus nothing to defendant's suggestion that other city officials would have to check the details of the contract after the Council's approval. Code of Ordinances, City of Saginaw, Vol. 1 (as amended, 1940).

seems to be the result in somewhat similar situations which have come to our attention. See United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620; Pennell v. City of New York, 17 App.Div. 455, 45 N.Y.S. 229; and see also cases cited 63 C.J.S., Municipal Corporations, § 1158, pp. 837, 838. At most the return of the contract would seem to be only a condition subsequent. We are cited to no authorities from Michigan or elsewhere suggesting the contrary. Under the circumstances we think plaintiff, who surely has all the equities, has established a prima facie case as to the law which defendant does not rebut. Indeed defendant appears to have itself conceded the weakness of its position by stipulating before the special master that the sale had been made in 1950.

Defendant's main argument as to the Saginaw furnace is based on the fact that this was a sewage installation. Defendant maintains that since the governing patent had been licensed, for sewage purposes, to The Underpinning & Foundation Co. Inc., it comes within a proviso clause of the Morse contract excluding all royalties. The clause in question reads: "[t]he party of the second part agrees to pay the party of the first part * * * royalties as follows: (a) For all furnaces sold or constructed * * * incorporating the design or designs of and the use or uses of any of the Patents * * * enumerated in Schedule A hereto annexed. * * * anything herein contained to the contrary notwithstanding the party of the first part is not to receive any royalties for furnaces construced for the disposal of municipal garbage, municipal waste and municipal sewage for which royalty payments are to be made to The Underpinning & Foundation Co. Inc."

■ We agree with plaintiff that, taking the contract as a whole, this proviso should be limited to the time period when all sewage installations were subject to royalties to Underpinning. The Underpinning contract, now fully paid off by defendant, had provided for payment either by annual minimum royalties or by royalties as earned. The patent involved in the Saginaw project, like all the Martin patents listed in Schedule A, had been licensed to Underpinning, and the license reassigned to plaintiff after a period in escrow, pending payment to Underpinning. We do not believe or conclude that plaintiff irrevocably gave up all rights to royalties from all of his patents when used for sewage—one of their major forms of exploitation. The proviso clause should be strictly construed to cover only those situations in which defendant would otherwise have been subject to double royalties: to Underpinning and to plaintiff. See Shilkret v. Musicraft Records, 2 Cir., 131 F.2d 929, certiorari denied Musicraft Records v. Shilkret, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699.

■■ The district court was therefore correct in upholding plaintiff's right to additional royalties for 1950. Defendant was thus subject to a liability of at least $1,500. We agree with the court below that this liability was not waived by failure to complain of nonpayment until May, 1951, although defendant's accounting had been due February 1. Plaintiff had earlier expressed his belief that royalties were due him, and there was no categorical denial of this claim by defendant until May. There is no suggestion that defendant was in any way prejudiced by the three months' delay. Plaintiff's acceptance of minimum royalties for 1951 as they became due in the interim between February and May does not bar his present action, since defendant's default did not relieve it of the remainder of its obligations under the contract. See 4 Corbin on Contracts § 954 (1951).

Once defendant was in default on royalties, plaintiff was entitled to reassignment of the licenses under Clause Sixth

(e) of the Morse contract.[3] Defendant's refusal to comply with a request to this effect resulted in plaintiff's severance of further relations with it, and ultimately led to this suit. Defendant now argues, in its counterclaim, that Clause Fourth (b) of the contract [4] was in the nature of a clause paramount, forbidding plaintiff from refusing personal services, even if defendant was in default, so long as there had been no arbitration of the dispute.

■ This reading of the contract by defendant is not tenable because it in effect reads Clause Sixth(e) out of the contract. Under the agreement, loss of all rights to the Martin patents was the price of default by either party. The provisions of Clause Fourth(b) must be limited to a wrongful refusal of services by plaintiff, or to an amicable severance of services from royalties, whose terms were to be worked out through arbitration. Defendant cannot now rely on the arbitration provision of either Clause Fourth(b) or Clause Tenth,[5] since it did not make a timely request for stay of judicial proceedings below. Almacenes Fernandez, S. A. v. Golodetz, 2 Cir., 148 F.2d 625, 161 A.L.R. 1420; American Reserve Ins. Co. v. China Ins. Co., 297 N.Y. 322, 79 N.E.2d 425. By failing to make such a request, defendant has waived any default of the plaintiff in failing to arbitrate.

We come now to the most troublesome issue in this litigation, namely, the present rights of the parties to the Martin patents. The special master appointed by Judge Byers recommended that plaintiff be entitled to minimum royalties so long as defendant refused to reassign the Martin licenses. Judge Byers accepted this recommendation, with the comment that if it seemed a harsh result defendant could sue for loss of personal services in an action at law.

■ We cannot accept this latter suggestion as a way out of the problem. Under F.R.C.P. 13(a), 28 U.S.C., defendant was obliged to plead in this action any counterclaim arising out of the basic transaction in plaintiff's claim. Certainly any setoff for loss of services on this contract should have been pleaded at this time or be forever barred by the principle of res judicata. See the authoritative article, Wright, Estoppel by Rule: The Compulsory Counterclaim Under Modern Pleading, 39 Iowa L.Rev. 255, 38 Minn. L.Rev. 423 (1954); and also discussion and cases cited in Clark on Code Pleading 646–648, also 482–483 (2d Ed.1947). And in fact defendant's request for relief on its counterclaim was sufficiently broadly worded to allow us to grant it a setoff,

3. "Sixth: (e) It is mutually understood and agreed that failure on the part of the party of the second part to pay any royalties and other compensation at the rates provided in this agreement to the party of the first part under this agreement shall terminate this agreement, it being understood and agreed that the party of the first part shall have no further claim or remedy against the party of the second part by reason of said termination except for royalties and compensation theretofore accrued. The party of the second part, upon such termination, shall deliver to the party of the first part suitable instruments of assignment, reassignment and cancellation of such Licensing Agreements."

4. "Fourth: (b) That should the party of the first part refuse to continue in the employment of the party of the second part in accordance with the terms of this agreement, all payments hereinafter provided for shall cease, and the party of the second part shall then be free to continue to manufacture, sell, distribute and construct and license others to manufacture, sell, distribute and construct the equipment covered by the Patents affected by this agreement without any further obligation to the party of the first part, except as to royalties and other compensation which have already accrued and been earned, unless there shall have been entered a final decision in arbitration as hereinafter provided justifying the refusal on the part of the party of the first part to continue in the employment of the party of the second part."

5. "Tenth: Any dispute between the parties hereto arising out of and under this Agreement shall be submitted by them to the American Arbitration Association for arbitration of said dispute or disputes and the decision of said association shall be binding on all parties hereto."

if appropriate, even though its counsel has never specifically requested such a remedy. See Selby Mfg. Co. v. Grandahl, 2 Cir., 200 F.2d 932, 934.

██ Under the facts as they exist here, however, we do not feel that defendant is entitled to any recoupment. Its wrongful failure to reassign the licenses in question is the sole reason for its continued liability thereon. Plaintiff specifically bargained for a return of the patents upon failure to pay royalties. As Professor Corbin points out, in a discussion of the right to restitution despite substantial breach of contract, "care must be taken not to penalize * * * the injured party * * * for standing on his exact rights under the contract." 5 Corbin on Contracts § 1124 (1951); and cf. Amtorg Trading Corp. v. Miehle Printing Press & Mfg. Co., 2 Cir., 206 F.2d 103.

Affirmed.