GENERAL ELECTRIC SUPPLY COMPANY, A DIVISION OF GENERAL ELECTRIC COMPANY, Appellant,

v.

GULF ELECTROQUIP, INC., Appellee.

No. 01–92–00596–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 25, 1993.

Rehearing Denied June 24, 1993.

Ben L. Aderholt, Tina Snelling, Hirsch, Glover, Robinson & Sheinell, P.C., Houston, for appellant.

Raymond A. Krell, P.C., Craig E. Power, P.C., Krell, Torigian & Power, Houston, for appellee.

Before SAM BASS, COHEN and HEDGES, JJ.

SAM BASS, Justice.

General Electric Supply Company (GESCO) appeals from a summary judgment rendered against it in favor of Gulf Electroquip, Inc. (Electroquip) on Electroquip's claims for sworn account, breach of contract, and quantum meruit in connection with a sale of goods to GESCO.

We affirm in part and reverse and remand in part.

In 1985, representatives of GESCO and Electroquip exchanged telephone calls and, later, purchase orders and similar documents. GESCO sought to reach agreement for Electroquip to sell to GESCO a used motor Electroquip had in stock. GESCO was in contact with a Libyan oil company, Jawaby Petroleum, that was interested in purchasing such a motor, and planned to resell the motor to Jawaby immediately.

Electroquip and GESCO agreed that Electroquip would sell the motor to GESCO, for a price of $50,000. As part of the deal, Electroquip was to modify the motor extensively, to adapt it to the specifications transmitted by GESCO. The original mo-

tor would be consumed in the process; one deposition witness likened it to carving up a Ferrari to reassemble it into a Chevrolet:

> [Y]ou have destroyed something that had value in order to make something else. You've taken a path in which there is no return. You destroyed one thing to build something else. You have to go ahead and continue with it or you don't have anything at all. You don't even have what you started with.

The sale was made subject to approval of Electroquip's engineering drawings for the modifications.

On December 2, Sam Phillips, an outside salesman for GESCO, called Electroquip's

sales manager, Mac Colvin, and told him that the drawings had been approved. Colvin then went over to GESCO and picked up a copy of GESCO's purchase order, dated November 21, 1985. Electroquip commenced the modifications to the motor. Phillips testified at deposition that upon commencement of the work, the contract became non-cancellable.

During late 1985, relations between the United States and Libya deteriorated.[1] On January 7, 1986, President Reagan issued executive order 12543,[2] prohibiting trade and certain transactions involving Libya, and on the following day issued executive order 12544, blocking Libyan government

1. *See generally, Farrakhan v. Reagan,* 669 F.Supp. 506, 508 (D.D.C.1987), *aff'd,* 851 F.2d 1500 (D.C.Cir.1988) (referring to terrorist bombings at airports in Rome, Italy and Vienna, Austria, and citing 50 Fed.Reg. 49809 (December 4, 1985) (State Department notice declaring U.S. passports invalid for travel to, from, and through Libya without special validation)) and *Chang v. U.S.,* 13 Cl.Ct. 555, 560 (1987), *aff'd,* 859 F.2d 893 (Fed.Cir.1988) (referring generally to "government pronouncements suggesting an accelerating deterioration of relations with Libya" during that time).

2. Executive order 12543 states, in pertinent part, as follows:

> Section 1. The following are prohibited, except to the extent provided in regulations which may hereafter be issued pursuant to this Order.
> (a) The import into the United States of any goods or services of Libyan origin, other than publications and materials imported for news publications or news broadcast dissemination;
> (b) The export to Libya of any goods, technology (including technical data or other information) or services from the United States, except publications and donations of articles intended to relieve human suffering, such as food, clothing, medicine and medical supplies intended strictly for medical purposes;
> (c) Any transaction by a United States person relating to transportation to or from Libya; the provision of transportation to or from the United States by any Libyan person or any vessel or aircraft of Libyan registration;
> (d) The purchase by any United States person of goods for export from Libya to any country;
> (e) *The performance by any United States person of any contract in support of an industrial or other commercial or governmental project in Libya;*
> (f) The grant or extension of credits or loans by any United States person to the Gov-

> ernment of Libya, its instrumentalities and controlled entities;
> (g) Any transaction by a United States person relating to travel by any United States citizen or permanent resident alien to Libya, or to activities by any such person within Libya, after the date of this Order, other than transactions necessary to effect such person's departure from Libya, to perform acts permitted until February 1, 1986, by Section 3 of this Order, or travel for journalistic activity by persons regularly employed in such capacity by a newsgathering organization; and
> (h) *Any transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order.*
> For purposes of this order, the term "United States person" means any United States citizen, permanent resident alien, juridical person organized under the laws of the United States or any person in the United States.
>
> . . . . .
>
> Section 3. This order is effective immediately, except that the prohibitions set forth in Section 1(a), (b), (c), (d) and (e) shall apply as of 12:01 a.m. Eastern Standard Time, February 1, 1986.
> Section 4. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of this Order. Such actions may include prohibiting or regulating payments or transfers of any property or any transactions involving the transfer of anything of economic value by any United States person to the Government of Libya, its instrumentalities and controlled entities, or to any Libyan national or entity owned or controlled, directly or indirectly, by Libya or Libyan nationals....

(Emphasis added). Sections 1(e), 1(h), and 4 of the order are the provisions GESCO relies upon.

property in the United States held by U.S. persons. Exec.Order No. 12,543, 51 Fed. Reg. 875 (1986) and Exec.Order No. 12,544, 51 Fed.Reg. 1235 (1986). On January 8, Phillips called Colvin, informed him of the situation, and inquired whether Electroquip could complete the work and ship the motor by January 16, before all provisions of order 12543 went into effect on February 1. Later that day, Colvin returned a confirming telex to Phillips, stating: "Your request to ship ... motor ... on 1/16/86 is not possible. This is approximately 3 weeks prior to the scheduled delivery. At your request of 1/8/86, we are stopping production on this order. The cancellation charges as of this date are 88 percent of the purchase price."

On January 9, Phillips returned a confirming telex to Colvin, saying: "Confirming receipt of your telex[.] ... Please cancel order[.] ... At this date we do not have a clear understanding from Jawaby on cancellation charges. GESCO cannot guarantee payment of these charges." The following day, Colvin responded, "Confirming receipt of your telex canceling your order[.] ... However, not in agreement that GESCO is not responsible for cancellation charges." A week after that, Colvin telexed Phillips again:

> We previously offered to settle for cancellation charges of 88 percent which we understand you have rejected. Given the fact that these are "specially fabricated" goods near completion, please advise whether or not you wish us to complete the manufacturing process so that the goods are 100 percent complete and in a sellable condition, or whether it is your desire to stop production.

The record contains no response from GESCO. GESCO admits that it cancelled the order not later than January 10, 1986. The goods were never completed; no settlement was ever reached; and this suit followed.

The trial court granted interlocutory summary judgment against GESCO in favor of Electroquip, without specific reference to Electroquip's several causes of action. Electroquip later presented evidence of its attorneys' fees, and the trial court

entered a final summary judgment. Where, as here, a trial court's order does not specify the grounds relied on for its ruling, the summary judgment will be affirmed on appeal if any of the theories advanced in the motion for summary judgment are meritorious. *Insurance Co. of North Amer. v. Security Ins. Co.*, 790 S.W.2d 407, 410 (Tex.App.—Houston [1st Dist.] 1990, no writ).

In one point of error, GESCO contends that the summary judgment was error because:

(1) Electroquip "failed, as a matter of law, to demonstrate that its performance ... was not a prohibited transfer [under executive orders 12543 and 12544]";

(2) even if the indirect transfer prohibitions of order 12543 did not apply to Electroquip, summary judgment was still improper because

(a) the affidavit attached to support Electroquip's motion for summary judgment merely stated that the allegations in the motion were true, which is insufficient under *Law v. Law*, 792 S.W.2d 150, 151 (Tex.App.—Houston [1st Dist.] 1990, writ denied);

(b) GESCO's response raised a genuine issue of material fact; and

(c) Electroquip's summary judgment evidence "involves an issue of intent which is inappropriate for summary judgment";

(3) summary judgment on Electroquip's allegation of an agreed restocking charge was improper;

(4) summary judgment was improper on GESCO's "claim of impracticability/impossibility"; and

(5) summary judgment was improperly granted on contested attorneys' fees.

In reviewing a summary judgment, this Court will take all evidence favorable to the nonmovant as true. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986); *Goldberg v. United States Shoe Corp.*, 775 S.W.2d 751, 752 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Every reasonable inference will be indulged in favor of the nonmovant, and any reasonable doubt will

be resolved in its favor. *Continental Casing Corp. v. Samedan Oil Corp.*, 751 S.W.2d 499, 501 (Tex.1988); *Goldberg*, 775 S.W.2d at 752. The movant has the burden of showing that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. *MMP*, 710 S.W.2d at 60; *Goldberg*, 775 S.W.2d at 752. When the plaintiff is the movant, the defendant cannot defeat summary judgment merely by pleading an affirmative defense. *Kirby Exploration Co. v. Mitchell Energy Corp.*, 701 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Instead, to defeat plaintiff's motion for summary judgment, the nonmovant defendant must respond by producing summary judgment evidence that raises a fact issue on each element of some affirmative defense. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984); *Kirby Exploration*, 701 S.W.2d at 926.

■ GESCO's first argument is that summary judgment for Electroquip was improper because GESCO raised a fact issue on every element of its illegality defense, and Electroquip then failed, as a matter of law, to meet GESCO's showing by demonstrating that its own performance was not, under executive orders 12543 and 12544, a prohibited direct or indirect transfer of goods, technology, or services to Libya.

Executive order 12544 was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. A summary judgment cannot be reversed on any grounds not presented in the motion for summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 676 (Tex.1979); *Dickey v. Jansen*, 731 S.W.2d 581, 583 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); TEX.R.CIV.P. 166a(c). For that reason, we will not consider executive order 12544 here.[3] We proceed to consider executive order 12543.

In discovery, Electroquip requested GESCO to admit that "in accordance with the agreement ... Gulf Electroquip, Inc. was to deliver the motor ... FOB, export packer, Houston, Texas on or before January 30, 1986." GESCO responded, "Denied. GESCO's Purchase Order contains all of the terms of the agreement. No mention, inter alia, is made of export packer." Later, GESCO requested Electroquip to admit that "among the terms of the subject sale was: delivery by Gulf Electroquip, Inc. to export packer." Electroquip responded, "The plaintiff objects as the contract between the parties speaks for itself. Denied."

The delivery terms of the Electroquip–GESCO contract are not set out in the November 21, 1985, purchase order, either on the obverse or the reverse.[4] In an instance where the contract is silent concerning the place for delivery of goods, TEX. BUS. & COM.CODE ANN. § 2.308 (Vernon 1968) controls. The pertinent portion states:

§ 2.308. Absence of Specified Place for Delivery

Unless otherwise agreed,

(1) the place for delivery of goods is the seller's place of business or if he has none his residence; but

(2) in a contract for sale of identified goods which to the knowledge of the parties at the time of contracting are in some other place, that place is the place for their delivery[.]

Under either of these tests, applied to the foregoing summary judgment evidence, the place for delivery of the motor was Houston, Texas. Regarding the first test, every bit of documentary summary judgment evidence in the record recites a Houston address for Electroquip. None of the summary judgment evidence suggests that Electroquip had any other place of business. Regarding the second test, both Colvin and Jim Petersen, the president of Electroquip, testified in their depositions that

---

**3.** Neither will we consider GESCO's contention on appeal that summary judgment was improper because "the evidence herein raises fact issues as to whether the parties' conduct was somewhat akin to a joint enterprise." GESCO has likewise failed to comply with this requirement of rule 166a with respect to that contention.

**4.** See n. 12, *infra,* and accompanying text.

Electroquip had the motor at issue "in stock" when the GESCO order came in. There was no other, contradictory summary judgment evidence to indicate that the motor was elsewhere than in Electroquip's possession at its Houston address at the time GESCO and Electroquip made their contract.

There was other summary judgment evidence that the contract called for Electroquip to deliver the motor by placing it in the possession of a designated export packer in Houston. Phillips testified at deposition that GESCO's contract with Jawaby called for GESCO to deliver the motor by placing it in the possession of a designated export packer in Houston, either by GESCO making whatever arrangements were necessary to get it to the export packer, or by GESCO paying Electroquip or some other party to have the motor delivered to the packer. He also testified that the delivery of the motor to the export packer ended GESCO's responsibilities with respect to the motor. Phillips' deposition testimony indicates that there is a conflict in the summary judgment evidence concerning *whether the contract specified* that the place for delivery was Houston. There is, however, no conflict and no genuine issue of material fact concerning the place for delivery; Phillips' deposition testimony also indicates that the place for delivery of the motor was Houston, Texas.

In *U.S. v. Elkins*, 885 F.2d 775 (11th Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990), Elkins appealed his conviction for conspiracy and violation of export restrictions in connection with the sale of two Lockheed C–130 military transport airplanes, one of which ultimately found its way into the hands of the Libyan Arab Air Force. 885 F.2d at 780. His conviction was based, at least in part, on executive order 12543. 885 F.2d at 779. Lockheed sold the two aircraft to a California corporation, AFI, that Elkins had created for the transaction; their contract provided that AFI had the sole responsibility to obtain a valid export license. 885 F.2d at 780. Lockheed's agreement

with Elkins' corporation bore much the same relation to Elkins' illegal transaction with his customer, a West German company owned by Libyans, as Electroquip's agreement with GESCO bore to GESCO's contemplated transaction with its Libyan vendee, Jawaby. The Eleventh Circuit's opinion lacks any hint that Lockheed's actions in any way violated the export restrictions concerning Libya. That void is some indication that the federal court regarded Lockheed's agreement as Electroquip asserts we should regard its agreement: as an "American to American" business deal whose consummation does not require a violation of executive order 12543.

Also instructive here is *Amtorg Trading Corp. v. Miehle Printing Press & Manufacturing Co.*, 206 F.2d 103 (2d Cir.1953). The case was a diversity case, governed by New York law. 206 F.2d at 105. There, Amtorg, a Soviet purchasing agency in New York, entered into a written contract to buy 30 printing presses, FOB Milwaukee, for the stated purpose of exporting them to the U.S.S.R. 206 F.2d at 104. The vendor, Miehle, delivered 10 presses on schedule. *Id.* Before delivery of the remaining 20 was due, new federal regulations took effect, and required an export license for export of such presses to the U.S.S.R. *Id.* Amtorg refused to take delivery of the remaining 20 presses and to pay the balance owing on them. *Id.* Amtorg sued to obtain return of the prepaid portion of the purchase price. *Id.* The Second Circuit rejected Amtorg's claim that "the federal export restrictions frustrated the basic purpose of the contract and thus terminated it," citing, *inter alia*, a New York case for the proposition that, even when the buyer's export purpose becomes frustrated, "there is no impossibility of performance where delivery to the buyer is to occur in this country." 206 F.2d at 105 (citing *Pierson & Co. v. Mitsui & Co.*, 111 Misc. 388, 181 N.Y.S. 273 (A.D. 4 Dept. 1920)). The summary judgment for Miehle was reversed and the cause remanded, but on other grounds not helpful to GESCO's cause here.[5]

5. Some time after the first legal battles between

Miehle and Amtorg arising from the transac-

GESCO contends on appeal that its contract with Electroquip required Electroquip to do more than merely deliver the motor to the designated export packer in Houston. GESCO asserts that Electroquip was required also to make shipping arrangements with the packer for sending the motor to Jawaby, and that, accordingly, a complete performance by GESCO, *including making the shipping arrangements*, would entail a violation of executive order 12543. This issue was not expressly presented to the trial court by written motion, answer, or other response, and we may not consider it as grounds for reversal. TEX. R.CIV.P. 166a(c). In any event, for the reasons set forth below in connection with the second branch of GESCO's second argument, any issue concerning whether Electroquip was required to make shipping arrangements with the packer for sending the motor to Jawaby is not a material fact issue.

Summary judgment for Electroquip was correct. According to the summary judgment evidence as presented to the trial court, Electroquip's obligations were to be performed exclusively inside the United States. Upon delivery of the motor, Electroquip's obligations under its contract with GESCO were to be complete. Electroquip's obligations did not involve export of the motor to Libya.

The Electroquip–GESCO contract was not a "contract in support of an industrial or other commercial or governmental project in Libya." If there was any such support for such a project, that support stemmed from whatever agreement GES-CO had with Jawaby or a related entity. There is no summary judgment evidence that Jawaby or a related entity was a party to the Electroquip–GESCO contract, or any other contract to which Electroquip was also a party.

GESCO's obligations under its contract with Jawaby or a related entity may have involved activity that would have violated executive order 12543. GESCO's unperformed obligation under its contract with Electroquip, however—paying Electroquip for the motor—did not violate executive order 12543. GESCO's paying Electroquip for the motor does not assist any Libyan entity in any way, and does not accomplish, even indirectly, any of the acts expressly prohibited by executive order 12543.

Similarly, Electroquip's performance of its contractual obligation to deliver the motor in Houston effected a transfer of the motor to *GESCO*, not to Jawaby. There was no summary judgment evidence that *GESCO* was, within the meaning of section 4 of executive order 12543, an instrumentality of the government of Libya, an entity controlled by the government of Libya, or an entity owned or controlled, directly or indirectly, by Libya or Libyan nationals. It was GESCO's performance of its contract with Jawaby that held the prospect of a direct transfer in violation of executive order 12543. Under *Elkins* and *Amtorg*, that prospect did not taint the Electroquip–GESCO contract, and did not make it an indirect transfer in violation of order 12543.[6]

GESCO's first argument is without merit.

---

tion, Miehle sold the 20 presses to the United States Bureau of Engraving and Printing for a price which was $18,765 more than its contract price to Amtorg. 206 F.2d at 105. Because of that sale, the court held that the federal Foreign Aid Appropriations Act of 1949 entitled Amtorg to restitution of its payments, to the extent they exceeded the damages Miehle suffered. 206 F.2d at 107 and 108.

**6.** *Phillips v. Wier*, 328 F.2d 368 (5th Cir.1964), cited by GESCO, *does not warrant a contrary result*. There, a bankrupt transferred property in alleged fraud of its creditors, by pledging it to a bank. 328 F.2d at 369. The bank later foreclosed upon the pledged property and sold it to Wier and Cullen. *Id.* The first act, the pledge, was held to be a direct "transfer" within the meaning of the relevant prohibitory provision of the Bankruptcy Act. 328 F.2d at 370. The second act, the foreclosure sale, was held to be an indirect transfer within that same provision. *Id.* Even if a bankruptcy case like *Phillips* were somehow more germane to the instant case than cases like *Elkins* and *Amtorg*, *Phillips* does not stand for the proposition that GESCO urges upon us here—namely, that a *subsequent* statutorily-prohibited direct transfer can cause a prior or intermediate transfer to become an indirect transfer to the ultimate transferee within the meaning of the prohibition.

GESCO's second argument, that summary judgment for Electroquip was improper even if the indirect transfer prohibitions of order 12543 did not apply to Electroquip, has three branches. The first branch is that summary judgment was improper because Colvin's affidavit attached to support Electroquip's motion for summary judgment was insufficient under *Law v. Law*, 792 S.W.2d 150, 151 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Colvin's affidavit, like Law's, is defective because it states no facts, and instead merely states that the allegations in specified substantive paragraphs of Electroquip's motion for summary judgment are true. Like Law's affidavit, Colvin's affidavit did not constitute summary judgment evidence. *Id.* It does not follow, however, that summary judgment for Electroquip was improper.

Summary judgment may be granted in the absence of any supporting affidavit. *See* TEX.R.CIV.P. 166a(a) and (b) (plaintiff or defendant may move for summary judgment with or without supporting affidavits). The trial court could properly look to the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, as well as the pleadings and any admissions, stipulations of the parties, or authenticated or certified public records on file at the time of the summary judgment hearing. TEX.R.CIV.P. 166a(c).

We have not considered, and will not consider, the defective Colvin affidavit. GESCO is entitled to no further relief, based on the merits of this branch of this argument.

The second branch of GESCO's second argument is that summary judgment for Electroquip was improper because GESCO's response controverted Electroquip's motion, and successfully raised a genuine issue of material fact. GESCO points to only one such supposed fact issue: whether Electroquip could have delivered the motor on January 30, 1986, before all provisions of executive order 12543 became effective, as Electroquip contends it could have.

GESCO admits that it cancelled the order not later than January 10, 1986. The parties disagree concerning the date delivery of the finished motor was due under their contract.[7] Resolving that dispute in favor of nonmovant GESCO, the deadline for Electroquip to deliver the motor was January 21, 1986, at the earliest. GESCO cancelled the order before the time for Electroquip's performance was due. Their contract did not give GESCO a right to cancel after work had begun, even if we assume, for argument's sake, that GESCO honestly and reasonably believed at some point prior to January 30 that Electroquip could not complete the work in time for the motor to be on its way to Jawaby before February 1. As of January 10, Electroquip had a right to at least another 11 days in which to perform.[8] GESCO's cancellation therefore constituted an anticipatory repudiation and breach by GESCO, which entitled Electroquip to suspend its own performance, accept the repudiation, and exercise an immediate right to sue for damages. *Universal Life & Accident Ins. Co. v. Sanders*, 129 Tex. 344, 102 S.W.2d 405, 406 (Comm'n App.1937); *Lufkin Nursing Home, Inc. v. Colonial Inv. Corp.*, 491 S.W.2d 459, 463

7. All copies of the November 21, 1985, purchase order reflect that delivery was due 8–10 weeks after approval of Electroquip's engineering drawings for the modifications. On that basis, GESCO contends on appeal that under the contract, the deadline for Electroquip to deliver the motor was "somewhere between January 21, 1986 and February 10, 1986." A copy of the November 21, 1985 purchase order produced from Electroquip's records contains the date "1/30/86" handwritten next to the typewritten "8–10 weeks" provision. On that basis, Electroquip asserts it was required to deliver the motor on or before January 30, 1986.

8. The Court's own calculation of the deadline for Electroquip to deliver the motor differs from GESCO's. GESCO contends on appeal that under the contract, the deadline for Electroquip to deliver the motor was "somewhere between January 21, 1986 and February 10, 1986." By our calculation, 8 weeks (56 days) from November 21, 1985 was January 16, 1986, and 10 weeks (70 days) from November 21, 1985 was January 30, 1986. The outcome does not change, however, because even by this calculation, as of January 10, 1986, Electroquip had a right to at least another 5 days in which to perform.

(Tex.Civ.App.—Amarillo 1973, no writ); *Troy Constr. Co. v. North Carolina Natural Gas Corp.*, 316 S.W.2d 957, 959 (Tex. Civ.App.—Waco 1958, writ ref'd n.r.e.); *Placid Oil Co. v. Humphrey*, 244 F.2d 184, 188 (5th Cir.1957) (citing *Pollack v. Pollack*, 46 S.W.2d 292, 293 (Tex.Comm'n App. 1932, holding approved) (opinion on reh'g)). GESCO's own breach rendered any fact issue concerning Electroquip's ability to deliver the completed motor by January 30 immaterial.[9]

In the third branch of its second argument, GESCO asserts that Electroquip's summary judgment evidence involves an issue of intent which, GESCO further asserts, cannot be resolved on summary judgment. This argument also fails. The only supposed "issue of intent" GESCO identifies is this same question whether Electroquip could have delivered the motor on January 30, 1986. That question is immaterial, and is no impediment to the summary judgment for Electroquip.

GESCO is entitled to no relief on the second and third branches of this argument.

 GESCO's third argument is that summary judgment for Electroquip was improper because a genuine issue of material fact existed concerning whether the contract terms included a 100 percent "restocking charge" applicable upon GESCO's cancellation of its order.[10] Assuming, as we must, in nonmovant GESCO's favor, that the restocking charge was not included in the contract, then we are left with a contract that was silent on damages recoverable in the event of a breach. In the absence of a contrary agreement, the nonbreaching party is entitled to all its actual damages necessary to put it in the same economic position it would have been in had the contract not been breached. *Capital Title Co., Inc. v. Donaldson*, 739 S.W.2d 384, 391 (Tex.App.—Houston [1st Dist.] 1987, no writ). In an appropriate case, expenditures to date plus anticipated profits is a proper method of computing such damages. *V.R. Wattinger Co. v. Moore*, 475 S.W.2d 327, 329 (Tex.Civ.App.—Austin 1972, no writ). In the trial court, the parties established the agreed purchase price for the motor; GESCO's failure to pay any portion of that price; and the destruction of the existing motor in the modification process, which rendered it worthless.[11] Even if the restocking charge was not included in the contract, Electroquip was entitled to receive actual damages—which, as it happens, were the same amount as the restocking charge Electroquip had sought during negotiations. *See Tufts v. Lawrence*, 77 Tex. 526, 14 S.W. 165, 166 (1890)

9. Any issue concerning whether Electroquip was required to make shipping arrangements with the packer for sending the motor to Jawaby was likewise rendered immaterial.

10. Ralph Mouret was the inside salesman for GESCO who worked with Phillips on this deal. He was the one who first called Electroquip seeking a quote on the motor and modification work. Mouret's notes of the call show, *inter alia*, that Electroquip made its quote subject to a "100% restock" fee, to apply if GESCO cancelled the order. The parties dispute whether this term was subsequently incorporated into their contract.

11. On appeal, GESCO complains that Electroquip "cannibalized valuable copper from the motor, failed to account for the sales proceeds from the copper windings, and further failed to make provision for the sales proceeds from other motor parts, including the salvage value of the motor[,] [even though] ... [Electroquip] judicially admitted that the motor shell, alone, had a salvage value." Mitigation of damages was not an element of Electroquip's breach of contract action. In a breach of contract action, the burden of proving the extent to which the plaintiff did or could have mitigated its damages is on the defendant. *Houston Chronicle Publishing Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 929 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). The only summary judgment evidence GESCO presented on mitigation was one conclusory statement in Mouret's affidavit, that "[t]he motor has some present value." The "judicial admission" is, apparently, the statement in Electroquip's First Amended Original Petition that "[t]he motor ... had a value of less than $1,000.00 as of January 8, 1986 as scrap." That statement is not an admission that any part of the motor had a salvage value, especially when taken in light of Electroquip's assertion in its motion for summary judgment that the "original motor had been destroyed in the manufacturing process and had little or no value[.]" GESCO did not raise a fact issue concerning any asserted failure by Electroquip to mitigate its damages.

(where buyer repudiated contract to purchase specially manufactured goods, seller was entitled to recover difference between the contract price and the value of the goods in the condition they were in when buyer communicated its repudiation); *Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex.App.—Houston [1st Dist.] 1991, no writ) (profit plus incidental damages, as set forth in section 2.708(b) of the Texas Business and Commerce Code, is the applicable measure of damages when a seller sues on buyer's breach of contract to purchase specialized piece of equipment, to be manufactured by seller, that has no market value); TEX.BUS. & COM.CODE ANN. § 2.708(b) (Vernon Supp.1993) (if difference between market price at time and place for tender and the unpaid contract price is inadequate, then the measure of damages is the profit seller would have made, plus incidental damages and costs reasonably incurred, less buyer's credit for payments or proceeds of resale).

In support of this argument, GESCO makes a subsidiary contention that the "standard terms and conditions" on the back of its purchase order were part of the agreement between itself and Electroquip. GESCO's admissions, strictly construed, preclude it from making this subsidiary contention.[12] We have reviewed the back side of the purchase order, however, and its terms do not address damages recoverable in the event of a breach, or otherwise affect the resolution of any of GESCO's assignments of error.

GESCO's fourth argument is that summary judgment for Electroquip was improper on GESCO's "claim of impracticability/impossibility." Looking beyond GESCO's label to the argument itself, GESCO contends that Electroquip failed to establish, as a matter of law, that GESCO, as a buyer, "could not assert the law of impracticability/impossibility under TEX.BUS. &

COM.CODE ANN. § 2.615 [ (Vernon 1968) ]." GESCO reasons that comment 9 to section 2.615 contemplates the exemption of a buyer, in certain circumstances, from fulfilling its contractual obligations when they have become commercially impracticable, such as, in the language of comment 9, "where the buyer's contract is in reasonable commercial understanding conditioned on a definite and specific venture or assumption[.]"

GESCO contends that comment 9 has "yet to be fully addressed by Texas courts," which we take to mean that no Texas court has ever ruled that a buyer may never assert a section 2.615 defense. Electroquip rejoins, asserting that there are no published Texas cases specifically authorizing a buyer to assert the defense of impracticability or impossibility for its failure to perform.

■ GESCO's reading of comment 9 is reasonable. We do not further endorse it, and we express no opinion on whether a buyer in Texas can assert the defense of impracticability or impossibility for its failure to perform. We agree only that Electroquip did not establish, as a matter of law, that a buyer is precluded in Texas from asserting the defense, and that GESCO did assert the defense. GESCO's complaint in this argument is that the trial court improperly (a) concluded that, as a matter of law, GESCO was not entitled to assert an impracticability defense, and (b) held that for that reason, GESCO had failed to raise an issue of fact on all elements of its impracticability defense, and, in turn, (c) rendered summary judgment for Electroquip on that basis. We find no indication in the record, however, that the judgment was based on this reasoning. Electroquip's motion for summary judgment did not urge this reasoning upon the trial court. On the contrary, Electroquip expressly stated,

> [GESCO's] only defense is set forth in Paragraph V of Defendant's Second

---

12. On appeal, the parties dispute whether the copy of the purchase order given to Colvin that day was just an obverse, or instead also included the reverse side, which set forth GESCO's "Standard Terms and Conditions of Purchase." GESCO, however, admitted, in response to a request for admission, that the document Electroquip attached to the request was a true and correct copy of the purchase order that Colvin picked up. That document consisted only of an obverse.

Amended Original Answer, which states: "GESCO would further show that the President of the United States issued on January 7, 1986, executive order 12543 which forbade GESCO and all parties from the subject transaction from exporting to Libya, purchasing goods or performing contracts with respect to Libya." As a matter of law, the executive order has no effect whatsoever.... There are absolutely no contested material factual issues in this case[.] ... *The only [legal] issue to be determined is the applicability or inapplicability of the Libyan sanctions,* which on their face are inapplicable to the facts in this cause, thus entitling [Electroquip] to judgment as a matter of law.

(Emphasis added.) Clearly, Electroquip did not attempt to persuade the trial court that reaching the merits of GESCO's defense was unnecessary. On the contrary, Electroquip asserted that, as a matter of law, executive order 12543 did not forbid either Electroquip or GESCO from completing their respective obligations under their contract. GESCO's fourth argument is without merit.

GESCO's sole remaining contention is a three-pronged attack upon the grant of summary judgment with respect to the contested attorneys' fees. GESCO argues that summary judgment on the fees was improper because (a) Electroquip never met its burden, under TEX.CIV.PRAC. & REM.CODE ANN. § 38.002 (Vernon 1986), to show that it had made demand or presentment as a predicate for the award of attorneys' fees; (b) Electroquip failed to establish the existence of a "restock agreement" to which TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986) would apply; and (c) Electroquip's voluminous exhibits and affidavits were specifically controverted, and GESCO's objections were itemized.

Demand letters from Electroquip's attorney to GESCO and General Electric Company dated June 18, 1986, and December 1, 1987, appear in the record. Electroquip met the prerequisites of section 38.002 for a recovery of its attorneys' fees. Moreover, although Electroquip failed to establish the incorporation of a restocking charge term in its agreement with GESCO, Electroquip established the existence of an oral or written contract for sale of the motor to GESCO, and section 38.001 applied to that contract. GESCO's first two attacks on the attorneys' fees award fail.

■ The third attack has merit. GESCO did controvert Electroquip's summary judgment evidence of its reasonable attorneys' fees. GESCO filed a reply to Electroquip's motion for final summary judgment, supported by a nine-page affidavit from GESCO's trial counsel, consisting of his opinion that the attorneys' fees sought by Electroquip were not reasonable, followed by approximately 45 particularized objections to the form and substance of the affidavits of Electroquip's trial counsel supporting Electroquip's motion.

Electroquip argues that the trial court was nevertheless authorized to take—and must be presumed to have indeed taken—judicial notice of the usual and customary attorneys' fees and of the contents of the case file, and to have awarded Electroquip its attorneys' fees on that basis. The cases cited by Electroquip, *Lacy v. First National Bank* [13] and *Bloom v. Bloom,* [14] did not involve summary judgment. [15] Cases dealing with the fixing of attorneys' fees by the trial judge when acting as the trier of fact have no application to a summary judgment proceeding. *Himes v. American Home Fence Co.,* 379 S.W.2d 290, 290–91 (Tex.1964). The only authority we find permitting the award of attorneys' fees on a summary judgment does not apply unless the evidence of the reasonableness of those fees is uncontroverted; it does not apply when, as here, conflicting affidavits from opposing attorneys are presented. *See, e.g., American 10–Minute Oil Change,*

13. 809 S.W.2d 362 (Tex.App.—Beaumont 1991, no writ).

14. 767 S.W.2d 463 (Tex.App.—San Antonio 1989, writ denied).

15. The *Lacy* court conducted a "full hearing on the merits," 809 S.W.2d at 363, while the *Bloom* decision was a post-answer default judgment, 767 S.W.2d at 465.

*Inc. v. Metropolitan Nat'l Bank—Farmers Branch,* 783 S.W.2d 598, 602 (Tex. App.—Dallas 1989, no writ); *Querner Truck Lines, Inc. v. Alta Verde Indus., Inc.,* 747 S.W.2d 464, 468–69 (Tex.App.—San Antonio 1988, no writ) (summary judgment on fees proper despite controverting affidavit because affiant was not an attorney and affidavit did not show that affiant was competent to give opinion testimony about attorneys' fees); *Sunbelt Const. Corp., Inc. v. S & D Mechanical Contractors, Inc.,* 668 S.W.2d 415, 418 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Gensco, Inc. v. Transformaciones Metalurgicias Especiales, S.A.,* 666 S.W.2d 549, 554 (Tex.App.—Houston [14th Dist.] 1984, writ dism'd); *Bado Equipment Co., Inc. v. Ryder Truck Lines, Inc.,* 612 S.W.2d 81, 83 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). Where the amount of attorneys' fees is not conclusively established, the attorneys' fees question may be severed and remanded for trial. *Pelto Oil Corp. v. CSX Oil & Gas Corp.,* 804 S.W.2d 583, 588 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (citing *Woods Exploration & Producing Co. v. Arkla Equipment Co.,* 528 S.W.2d 568, 571 (Tex.1975)).

Summary judgment for Electroquip on attorneys' fees was improper. That portion of the trial court's judgment must be severed, reversed, and remanded for trial. As respects the underlying breach of contract claim, however, Electroquip presented summary judgment evidence of the existence and terms of the contract; GESCO's cancellation; the agreed purchase price of the motor; and GESCO's failure to pay any portion of that price. This summary judgment proof encompassed all elements of Electroquip's cause of action for breach of contract. GESCO failed to raise a fact issue on all elements of its affirmative defense of illegality, and none of the supposed fact issues GESCO has identified are material.

The issue of attorneys' fees is severed from the cause of action, the award of attorneys' fees is reversed, and that issue is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.