**PELTO OIL COMPANY, Appellant,**

v.

**CSX OIL & GAS CORPORATION, Appellee.**

No. 01–89–00768–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 24, 1991.

Rehearing Overruled Feb. 28, 1991.

Patricia Eldridge, Michael Kuhn and Anthony Duenner, Bracewell & Patterson, Houston, for appellant.

Michael B. Silva, Paul V. Swearingen and James R. Leahey, Baker, Brown, Sharman, and Parker, Houston, for appellee.

Before EVANS, C.J., and MIRABAL and DUGGAN, JJ.

## OPINION

DUGGAN, Justice.

This appeal from a summary judgment centers on the appropriate remedy in a gas production misallocation case. Appellant, Pelto Oil Company ("Pelto"), brought this action for damages against appellee, CSX Oil & Gas Corporation ("CSX"). Part of Pelto's share of gas production from an offshore platform for a 14–month period was sold to Texas Gas Transmission Corporation ("Texas Gas"), but was mistakenly allocated by the unit operator to CSX. Texas Gas paid CSX for the gas it bought, including the gas that should have been allocated to Pelto, and CSX refused to pay such proceeds to Pelto.

Pelto and CSX are coworking interest owners under oil and gas leases covered by the Ship Shoal Block 271 Unit ("the Unit") in the Outer Continental Shelf, offshore Louisiana in the Gulf of Mexico. Other owners (as of February 1988) include CNG Producing Company ("CNG"), which is also the Unit operator, Columbia Gas Development Corporation, and Odeco Oil & Gas Company. The Unit is governed by the Unit Operating Agreement, effective June 10, 1966, as subsequently amended, to which all owners are parties. The owners are also parties to a Gas Balancing Agreement dated January 28, 1981.

Article 8 of the Unit Operating Agreement provides that each party has

*the absolute and unqualified right at all times to take in kind all or any part of its interest in the oil and gas produced* and saved from the unit property exclusive, however, of production which may be used in development and producing operations on the unit property or which may be unavoidably lost during the conduct of such operations, and *each party shall have the sole and exclusive right to direct and effect the sale and disposition of its respective interest in such production. Under no circumstances shall any party hereto have the right to market any other party's interest in production* and each party shall be required to sign all division orders, contracts, agreements, options to purchase or sell, and all other instruments affecting the marketing, disposition or sale of such party's interest in production from the unit property. Operator shall deliver each party's proportionate share of production into the pipe line or lines to which the well or wells may be connected or to such other transportation facilities as may be available to the credit of such party, unless such party shall elect to receive all or any part of its proportionate share of such production in kind. *Any additional expenditures, together with all risk incident thereto, incurred as a result of the taking in kind or the separate sale or disposition by any party hereto of its interest in production from the unit property shall be borne entirely by such party.*

(Emphasis added.)

The Gas Balancing Agreement provides that each party has made, or will make,

arrangements to sell or utilize its share of gas production from the Unit's offshore platform. After notice to the operator, a party may begin taking or delivering to a purchaser its full share of the gas produced. It is the operator's obligation to maintain an account of the gas balances among the parties, and to furnish monthly to each party a statement showing the total quantity of gas produced, the portion used in platform operations or vented or lost, the total quantity of gas taken or delivered to market for the account of each party, and the monthly and cumulative "over" and "under" delivery of each party.

The Gas Balancing Agreement recognizes that, from time to time, "one or more of the parties may be unable to take or market its interest in the gas production." Therefore, the parties agreed that

> *during any period when a party does not dispose of its full share of the gas produced from said platform,* any other party may produce from said platform and take or deliver to purchaser, before any processing thereof, each month, *all or a part of that portion of the gas production* assigned thereto by any governmental body regulating same, *which is not produced by a party taking less than its full share.*

(Emphasis added.) When a party does not take its full share of the gas produced, it is credited with "gas in storage." The Gas Balancing Agreement goes on to state that a party with "gas in storage" is entitled to take or deliver to a purchaser its current share of the gas produced, plus 50% of the gas attributable to a party or parties who are in an "overproduced" status. If the gas accounts are not balanced at the time production from the platform is discontinued, a financial settlement must be made among the parties.

Pelto entered into a "take or pay" style Gas Purchase Contract, dated March 30, 1981, with Texas Gas. At that time, and until September 30, 1987, CSX (known then as Texas Gas Exploration Corporation) was

a wholly owned subsidiary of Texas Gas.[1] CSX also entered into a gas purchase agreement with Texas Gas.

Texas Gas notified Pelto and the unit operator, CNG, by various letters that it wished to have a certain volume of gas delivered to it under its contract with Pelto during the period September 1984 through October 1985. CNG delivered the specified volumes to Texas Gas, but mistakenly allocated the deliveries to CSX (which was also delivering to Texas Gas at this time under their contract) instead of to Pelto. The monthly statements, which CNG prepared and sent to all owners, show none of the gas production allocated during those months to Pelto to have been delivered to Texas Gas. Texas Gas paid CSX based on the monthly statements. The price was the maximum lawful price prescribed under the Natural Gas Policy Act of 1978, plus a gathering charge. The parties do not dispute that CNG mistakenly failed to allocate to Pelto that part of its share of production sold to Texas Gas. However, they do disagree about the remedy available to correct the mistake.

Pelto apparently did not discover the mistake until late November or early December 1985. Pelto made demand on CSX to pay it the amount CSX had received for Pelto's share. CSX declined.

Pelto filed suit against CSX on November 24, 1987, alleging that CSX breached the Unit Operating Agreement, to which both were parties, by wrongfully marketing Pelto's interest in gas produced from the Unit to Texas Gas. Pelto further alleged that CSX was unjustly enriched at Pelto's expense when it retained the proceeds from the sale of Pelto's share of the gas to Texas Gas, and that allowing CSX to retain the proceeds would be unconscionable. Pelto sought $641,691.16 in damages, attorney's fees, and interest.

CSX filed a general denial on December 29, 1987. It amended its answer on December 8, 1988 to state that: (1) under the Gas Balancing Agreement, when a party for

---

**1.** Following mergers, name changes, and a stock transfer via a dividend, Texas Gas Transmission Corporation and CSX Oil & Gas Corporation are affiliated companies, sharing a common parent, CSX Energy Corporation.

any reason fails to dispose of its share of gas production, any other party may produce that amount of gas; (2) a party's "overproduced" share of gas production, and proceeds therefrom, belongs to that party, but the "underproduced" party or parties are credited with gas in storage, which may later be withdrawn in kind from the overproduced party's future production during the platform's productive life, or paid for in cash by the overproduced party after the platform's production is discontinued; (3) each unit owner expressly agreed to bear the risk incident to separately marketing its respective interest in gas production; (4) the Gas Balancing Agreement is the exclusive remedy in situations of overproduction and underproduction; and (5) gas balancing agreements are widely used in the industry to adjust production imbalances caused by delivery errors. CSX also asserted that the Gas Balancing Agreement modified the Unit Operating Agreement, and that it had committed no breach of the Unit Operating Agreement, although the Unit operator, CNG, may have. Furthermore, CSX contended that it was not unjustly enriched because it marketed its own gas production due to Pelto's failure to dispose of its share of production. Finally, CSX argued that Pelto's claims were barred by the statute of limitations and the doctrine of laches and stale demands. CSX counterclaimed against Pelto for a declaratory judgment to determine that the Gas Balancing Agreement provided Pelto's exclusive remedy against CSX, and for attorneys' fees.

Both parties moved for summary judgment. Each contended that there was no issue of material fact, and each claimed to be entitled to summary judgment as a matter of law. Pelto based its demand for summary judgment on CSX's breach of the Unit Operating Agreement, or, alternatively, on unjust enrichment for money had and received. CSX demanded summary judgment, claiming that: (1) as a matter of law, it did not breach the Unit Operating Agreement; (2) CSX produced, delivered, and sold its own gas to Texas Gas; (3) CSX and Pelto expressly agreed upon in-kind gas balancing under the Gas Balancing Agreement as the exclusive method of balancing the gas accounts during the productive life of the platform; and (4) Pelto's pleadings demonstrated that its claim for money had and received was in reality a suit for conversion that was barred by the two-year statute of limitations. The trial court granted CSX's motion for summary judgment.

■ In two points of error, Pelto asserts that the trial court erred in granting CSX's motion for summary judgment, and in denying Pelto's motion for summary judgment. The denial of Pelto's motion for summary judgment is appealable because both Pelto and CSX moved for summary judgment, and one motion was granted, and the other was overruled. *Tobin v. Garcia*, 159 Tex. 58, 63–64, 316 S.W.2d 396, 400 (1958).

Because Pelto's pleadings alleged multiple causes of action, in order to secure a summary judgment on the entire case, CSX was obligated to show conclusively that no fact issue existed concerning at least one essential element of each of Pelto's causes of action. *See Christiansen v. Sherwood Ins. Serv.*, 758 S.W.2d 801, 803 (Tex.App.—Texarkana 1988, writ denied); *Mary Kay Cosmetics, Inc. v. North River Ins. Co.*, 739 S.W.2d 608, 609 (Tex.App.—Dallas 1987, no writ).

In a conflict of summary judgment claims, Pelto asserts that the Gas Balancing Agreement is not the sole and exclusive remedy for all gas production allocation imbalances; CSX asserts that it is. Specifically, Pelto contends, the Gas Balancing Agreement does not apply in the case of accounting errors.

■ Remedies provided in a contract may be permissive or exclusive, and the mere fact that the contract provides a party with a particular remedy does not necessarily mean that such a remedy is exclusive. *Bifano v. Young*, 665 S.W.2d 536, 539 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Vandergriff Chevrolet Co. v. Forum Bank*, 613 S.W.2d 68, 70 (Tex.Civ. App.—Fort Worth 1981, no writ). The Gas Balancing Agreement contains no express

clause stating that it is the sole and exclusive remedy in the event gas production accounts become unbalanced. In its preamble, the Gas Balancing Agreement recognizes that one or more of the parties "may be unable to take or market its interest in the gas production from time to time." In this case, Pelto was able to take part or all of its share of production, and had, in fact, marketed part or all of its share of production to Texas Gas. Pelto would have been credited with delivering such share of production to Texas Gas, but for the accounting error of CNG. In contract interpretation, words are to be given their plain meaning. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Insurance Co. of North Am. v. Cypress Bank*, 663 S.W.2d 122, 124 (Tex. App.—Houston [1st Dist.] 1983, no writ). We find that the plain meaning of "may be unable to take or market" does not include failures to credit a company with delivering its share of production, which it had in fact taken and marketed, as a result of another's accounting error. Therefore, the Gas Balancing Agreement does not apply.

CSX urges that *Chevron U.S.A., Inc. v. Belco Petroleum Corp.*, 755 F.2d 1151 (5th Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985), stands for the proposition that where parties have expressly agreed upon in-kind balancing as the exclusive method of balancing, a court may not supersede the parties' express agreement by imposing an implied or quasi-contract that would have the effect of premature cash balancing contrary to their agreement. The facts in *Chevron* are quite different from those here. The balancing agreement between Chevron and Belco, drafted by Chevron, provided only for in-kind gas balancing. *Id.* at 1154. Before Chevron completed a gas purchase agreement with its customer, and received its Federal Power Commission certificate, the field had stopped producing. *Id.* at 1152–53. Chevron sought a cash payment from Belco for its share of revenues from Belco's sale of the field's gas. *Id.* at 1153. The court held that, because the gas balancing agreement provided only for in-kind balancing, Belco did not breach the agree-

ment when it refused to pay Chevron in cash. *Id.* at 1154. Chevron, unlike Pelto in our case, had not attempted to take its share of production prior to the depletion of the reservoir.

■ Pelto contends in its motion for summary judgment, contrary to the claims in CSX's motion for summary judgment, that CSX breached the marketing of products provision of the Unit Operating Agreement, which gives to each working interest owner "the sole and exclusive right to direct and effect the sale and disposition of its respective interest in production," and prohibits an owner from marketing any other owner's interest in production. CSX argues that CNG, as Pelto's agent, failed to deliver Pelto's share of production, and that Pelto is bound by the acts of its agent. However, it can be stated with equal correctness that CNG was also the agent of CSX, and that CSX is bound by the acts of its agent. Furthermore, since all working interest owners received copies of the monthly allocation reports from CNG, they were equally knowledgeable concerning allocation errors regarding their respective shares of production. Therefore, we find that Pelto proved that CSX breached the Unit Operating Agreement when it failed to turn over to Pelto the proceeds of gas sales CSX received, which should have been allocated to Pelto.

Because we find that CSX failed to negate at least one element of Pelto's breach of contract claim, we hold that the trial court erred in granting CSX's motion for summary judgment. Because we also find that Pelto proved CSX breached the Unit Operating Agreement, we hold that the trial court erred in failing to grant Pelto's motion for summary judgment on its breach of contract cause of action.

■ Finally, we consider Pelto's claim to attorney's fees. Reasonable attorney's fees may be recovered if the claim is for an oral or written contract. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). The record reflects that Pelto prayed for attorney's fees in its summary judgment motion, but presented no summary judg-

ment proof to the trial court on attorney's fees. Neither did Pelto plead for the trial court to take judicial notice, under TEX.CIV. PRAC. & REM.CODE ANN. § 38.004 (Vernon 1986),[2] "of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence" in the "proceeding before the court."

On appeal, Pelto asks this Court to award it attorney's fees based on section 38.004. It candidly concedes that it is aware of no authority that permits an appellate court to award attorney's fees. Nevertheless, it asserts that we can take judicial notice of "the contents of the case file," which allegedly shows that it is entitled to approximately $70,000 in attorney's fees. We disagree. The literal language of section 38.004, with its contrast between "a proceeding before the court," section 38.004(1), and "a jury case," section 38.004(2), makes clear that "the court" referred to is the trial court, with its ability to make fact findings. Case authority considering awards of attorney's fees under other statutes have consistently held that appellate courts may not initiate an award of attorney's fees, because to do so would constitute the exercise of original rather than appellate jurisdiction, *International Security Life Ins. Co. v. Spray*, 468 S.W.2d 347, 349 (Tex.1971) (interpreting TEX.INS.CODE ANN. art. 3.62), or be in effect a usurpation of the trial court's fact finding function, *Industrial Disposal Supply Co. v. Perryman Bros. Trash Service, Inc.*, 664 S.W.2d 756, 760 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (interpreting TEX.REV.CIV.STAT.ANN. art. 2226, now TEX. CIV.PRAC. & REM.CODE ANN. § 38.001).

 Pelto urges, in the alternative, that we remand for a determination of attorney's fees. It asserts that "it did not waive the claim by failing to present specific evidence of attorney's fees," as it made a specific request for such fees in its amended petition and its motion for summary judgment. We follow the reasoning of the

Texas Supreme Court in *Woods Exploration & Production Co. v. Arkla Equipment Co.*, 528 S.W.2d 568 (Tex.1975). Where the amount of attorney's fees is not conclusively established, even when no proof was offered with respect to that issue, the cause may be remanded for a determination of attorney's fees only. *Id.* at 571.

We sustain Pelto's first and second points of error.

Because we hold that Pelto was entitled to summary judgment on its breach of contract cause of action, we need not consider CSX's argument concerning a limitations defense to Pelto's alternate claims of money had and received and unjust enrichment.

The question of reasonable attorney's fees is severed and is remanded for trial. The summary judgment entered by the trial court in favor of CSX is reversed, and judgment is hereby rendered in favor of Pelto for $641,691.16 in actual damages, plus pre- and post-judgment interest and costs.

---

2. Section 38.004 states:
 The Court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in: (1) a proceeding before the court; or (2) a jury case in which the amount of attorney's fees is submitted to the court by agreement.