**ENTERPRISE PRODUCTS CO.; Texaco Exploration and Production, Inc.; Meridian Oil Hydrocarbons, Inc.; and Union Pacific Fuels, Inc.; Appellants,**

v.

**TENNECO INC.; Tenneco Oil Company; Enron Natural Gas Liquids Corporation; Enron Liquids Pipeline Company; Enron Liquids Pipeline, L.P.; and Enron Corp.; Appellees.**

No. 01–93–00829–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 13, 1995.

Rehearing Overruled Sept. 14, 1995.

Murray Fogler, Houston, for Appellants.

Richard Keeton, Thomas Farrell, Jack D. Ballard Albert R. Lohse, Rosemarie Donnelly, Solace H. Kirkland, Houston, for Appellees.

Before ANDELL, HEDGES and FARRIS *, JJ.

## OPINION

ANDELL, Justice.

The appellants, the owners of respective shares in a gas processing plant that total 75 percent, have sued the appellees for, variously, breach of contract, breach of fiduciary duty, and tortious interference with contract. The appellants' claims arise from and/or otherwise relate to their former co-owner's transfer of the other 25 percent of the plant to its subsidiary; and from two subsequent, successive transfers of 100 percent of the subsidiary's stock. Appellants sought damages or specific performance (1) from the new co-owner, for alleged breach of a duty to supply a specified minimum volume of raw material to the plant; (2) from other appellees, for allegedly breaching a duty to secure the new co-owner's express agreement to supply that minimum volume; and (3) from each appellee, for allegedly breaching and/or interfering with the appellants' contractual preferential right to purchase their former co-owner's share of the plant. The court below granted summary judgment for the appellees on all of the appellants' claims. We reverse and remand.

The background to the series of three transfers at issue in this case begins in 1982. That year, appellant Enterprise Products Company (Enterprise) put a natural gas liquids fractionation plant (the Plant) into service in Mont Belvieu, Texas. After transactions taking place between 1982 and 1985, Enterprise owned 68.75 percent of the Plant, and appellant Texaco Exploration and Production, Inc. (TEPI) and two other entities, El Paso Hydrocarbons Company (El Paso) and Champlin Petroleum Company (Champlin), owned respective shares totalling the remaining 31.25 percent.

The provisions of the three agreements governing the rights of the parties to this appeal are shown by uncontradicted summary judgment evidence, and are not in dispute. All three were executed on July 17, 1985.

First, Enterprise and appellee Tenneco Oil Company (TOC) signed the articles of partnership (Partnership Agreement) that formed Mont Belvieu Associates (MBA)—a general partnership, of which TOC was the managing partner. The purpose of the partnership was to effect an indirect transfer of an interest in the Plant from Enterprise to TOC. Enterprise and TOC each owned 50 percent of MBA, and MBA purchased a 50 percent interest in the Plant from Enterprise. Section 9.3 of the Partnership Agree-

---

* The Honorable David F. Farris, former justice, Court of Appeals, Second District of Texas at Fort Worth, sitting by assignment.

**448**

ment provides that "The Partners expressly acknowledge that any sale or other transfer of their respective Partnership Interest is subject to a right of first refusal held by all other Owners as set forth in [the other two agreements executed that day]." Section 9.5 provides, in pertinent part, that either partner may transfer, assign or convey its rights in MBA to any affiliate, without the consent of the other partner, so long as any such transfer, assignment or conveyance does not cause a termination of the MBA partnership for federal income tax purposes, and certain other specified conditions are met. The terms of the Partnership Agreement are not otherwise material here.

Next, Enterprise and TEPI—along with El Paso and Champlin—entered into a "Restated Operating Agreement for the Mont Belvieu Fractionation Facilities, Chambers County, Texas" (the Restated Operating Agreement or ROA). The ROA was made retroactively effective as of January 1, 1985. Under section 5.4 of the ROA, each owner was obligated, under certain conditions, to bring unprocessed natural gas liquid mixtures[1] it owned or controlled to the Plant and have them fractionated at the Plant.[2]

Finally, MBA and the parties to the ROA executed an instrument captioned Ratification and Joinder Agreement (RJA). The RJA made MBA a party to the Restated Operating Agreement, and provided that

TOC would be deemed to be an owner of a share of the Plant for purposes of article 12 of the ROA.[3] The terms of the RJA are not otherwise material here.

The parties' dispute arises under article 12 of the ROA, which set out provisions addressing transfer of ownership interest in the Plant. In pertinent part, article 12 states:

12.1 *When Transfer of Ownership Interest Permitted.* Subject to the provisions of Section 12.5 ... hereof, an Owner shall have the right to sell, transfer, assign, or otherwise convey all or any portion of its Ownership Interest, either in favor of another Owner or a third party.

12.2 *When Transfer Effective.* (a) No sale, transfer, or assignment of Ownership Interest authorized by Section 12.1 shall be effective hereunder until: (i) a duly executed counterpart original or certified copy of the recorded instrument or instruments evidencing such change in Ownership Interest has been delivered to Operator, together with a like counterpart original of an instrument acceptable in form to Operator wherein the assignee adopts and ratifies this Agreement for all purposes as an Owner, and (ii) the assignee enters into an agreement with Operator to put through the Facilities a volume of raw

---

1. The term "raw make," sometimes used elsewhere in the parties' agreements, is synonymous; both refer to the raw material supplied to the Plant for processing.

2. Section 5.4 of the ROA states:
 5.4 *Commitment of Natural Gas Liquids Mixtures.* Each Owner hereby commits for fractionation in the Facilities during the term of this Agreement, all owned and/or controlled natural gas liquid mixtures up to a maximum volume equal to each such Owner's proportionate Ownership Interest in the Facilities multiplied by the total throughput capacity of the Facilities on June 3, 1985, as increased by the Expansion and Energy Conservation Project (the throughput capacity estimated to be 130,000 Barrels/Day) if such natural gas liquid mixtures are transported: (i) to within a fifty (50) mile radius of Mont Belvieu and are not otherwise legally obligated to fractionation at other facilities prior to January 1, 1985, and (ii) through pipelines which are connected to the Facilities. Each Owner agrees to execute

fractionation agreements for the processing of same.

3. The RJA provided, in pertinent part, that

All references to "Owners" contained in the Agreements ratified hereunder shall mean and include [MBA] for all the purposes expressed in such agreements, except that the following addition shall apply to the definition of "Owners" contained in Article I of the [ROA]: "For purposes of Articles ... [12 and others] of [the ROA], Enterprise and [TOC] shall be deemed to each be an Owner of twenty-five percent (25%) Ownership Interest as a result of its participation in [MBA] and both [TOC] and Enterprise individually shall have the right to exercise all the rights, powers and privileges and be subject to all of the terms and provisions applicable to an Owner pursuant to the above referenced articles. Each shall also have the rights of an individual Owner for interests owned separate from its interest in [MBA]."

make per day at least equal to the volume set forth opposite the name of the Selling Owner on Schedule C hereto.[4]

. . . .

12.5 *Preferential Right to Purchase. Except as provided in Section 12.6 hereof,* if any Owner should desire to sell, transfer or assign all or any part of its Ownership Interest, the other Owners shall have the prior and preferential right and option to purchase proportionately the interest to be sold by such Owner upon the same terms and conditions as the bona fide prospective purchaser or purchasers (collectively "Offeror") are offered by such Owner (the "Selling Owner"). . . .

12.6 *Transfer Permitted.* The prior and preferential right of the Owners to purchase the interest of any Owner desiring to sell *or transfer* all or any part of its Ownership Interest shall not apply to (a) a transfer occurring by reason of the merger or reorganization of any Owner, (b) *a transfer by any Owner to any Affiliate*[5] or to all of its shareholders (c) a transfer in connection with a sale or other conveyance of all or substantially all of the assets of any corporate Owner, (d) a transfer of an interest (i) to Mont Belvieu Associates (a Texas general partnership) which is not more than fifty percent (50%) of the total Ownership Interests and which is made of even date, and (ii) by Mont Belvieu Associates of all or any part of its Ownership Interest to Tenneco or Enterprise, or (e) a transfer of an interest which (i) is not more than twelve and one-half percent (12.5%) of the total Ownership Interests, and (ii) is sold, transferred or assigned to El Paso on or before December 31, 1986.

(Emphasis added.)

The series of three transfers at issue in this case began in 1989, with the transaction (the First Transfer) in which TOC transferred its interest in MBA to an affiliate called Tenneco Natural Gas Liquids Corporation (TNGL).

The second transfer at issue here (the Second Transfer) occurred in the fall of 1991. Originally, appellee Tenneco Inc. offered several packages of assets for sale, including TNGL's interest in MBA.[6] Enron Gas Processing Company (EGP), a subsidiary of appellee Enron Corp., submitted the winning bid on November 19, 1991, accompanied by a proposed form of agreement to purchase

---

4. No copy of the ROA in our record includes a "Schedule C." All copies of the ROA in our record include an "Exhibit C," but neither Exhibit C nor any other attachment, exhibit, or schedule included with any of those copies of the ROA *sets forth any volume of raw make opposite the name of any owner of an interest in the Plant.* The RJA, however, provided that "Exhibit 'C' to the Restated Operating Agreement shall be deleted and the exhibit attached hereto as Exhibit 'A' and incorporated herewith shall be substituted therefore [sic]"; and Exhibit A to the RJA consists of the following table, which sets forth daily volumes of "raw make" as contemplated by the language of section 12.2 of the ROA:

| Company | Ownership Interest | Barrels/Day Raw Make Capacity |
|---|---|---|
| [TEPI] | 12.5% | 15,500 |
| [MBA] | 50.0% | 62,000 |
| [TOC] | 25.0% | 31,000 |
| [Enterprise] | 25.0% | 31,000 |
| El Paso Hydrocarbons Company | 12.5% | 15,500 |
| Champlin Petroleum Company | 6.25% | 7,750 |
| [Enterprise] | 18.75% | 23,250 |
| TOTAL | 100.00% | 124,000 |

Accordingly, when applicable to a particular transfer of an ownership interest in the Plant, section 12.2 of the ROA committed the transferee to a delivery obligation different from that which had formerly applied to its transferor under section 5.4 of the ROA. *See* note 2, *supra.*

5. Section 1.1 defined terms used in the ROA; and, in pertinent part, provided that

*"Affiliate"* means, as to the party specified, any person controlling, controlled by or under common control with such party, with the concept of control in such context meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another, whether through the ownership of voting securities, or otherwise.

6. According to the allegations of appellants' second amended petition, "[i]n order to finance the transaction, Tenneco Inc. sold a pipeline known to the parties here as the "Dean Products pipeline" in a *contemporaneous separate asset sale.*" *See* note 10, *infra.*

TNGL's interest in the Plant. Subsequently, in place of the originally contemplated asset sale, Tennessee Gas Pipeline Company (Tennessee) (which, although an affiliate of TOC,[7] was never a party to this suit), sold the stock of TNGL to EGP. TNGL was later renamed and thereby became appellee Enron Natural Gas Liquids Corporation (ENGL).

By June 17, 1992, appellants Meridian Oil Hydrocarbons, Inc. and Union Pacific Fuels, Inc. had succeeded to El Paso's and Champlin's respective interests in the Plant. On that date, appellants filed suit against appellees Tenneco Inc., TOC, and ENGL, complaining of the two transfers described above.

The third transfer at issue in this case (the Third Transfer) occurred in August 1992, when EGP transferred the stock of ENGL, the entity holding the interest in MBA, to an "operating limited partnership," Enron Liquids Pipeline Operating Limited Partnership (OLP). Appellee Enron Liquids Pipeline, L.P. (ELP–LP)[8] was the sole limited partner of OLP, and OLP was managed by appellee Enron Liquids Pipeline Company (ELPC).

By twice amending their original petition, appellants added appellees Enron Corp., ELP–LP, and ELPC as defendants,[9] added a complaint about the Third Transfer, and otherwise honed their claims against appellees.[10] Shortly thereafter, the trial court granted an interlocutory summary judgment in favor of the Enron Defendants that "plaintiffs take nothing on their claims against them in this case." The Tenneco Defendants then filed a substantively identical motion for summary judgment on appellants' claims against them related to the 1991 transaction between the Tenneco Defendants and the Enron Defendants. The Tenneco Defendants filed a second motion for summary judgment, concerning the First Transfer, the 1989 transaction in which TOC transferred its interest in MBA to TNGL. The trial court granted the Tenneco Defendants' second motion for summary judgment, on "all claims arising from or relating to the 1989 and 1990[11] transac-

---

7. According to the brief filed by Tenneco Inc. and TOC, Tennessee Gas Pipeline Company was an "affiliate" of TOC. It is unclear whether the term as there used has precisely the same meaning as in section 1.1 of the ROA (*see* note 5, *supra*); moreover, we have been unable to find affirmative support for this assertion in the record. None of the other parties expressly disputes that assertion in its appellate brief, however, and, in any event, the question does not appear to be material to our decision here.

8. Appellants refer to ELP–LP, at times, as the "master limited partnership" (MLP).

9. At times, we shall refer to these three entities, together with ENGL, as, collectively, the "Enron Defendants"; and to Tenneco Inc. and TOC as, collectively, the "Tenneco Defendants."

10. Appellants asserted contract claims that (a) ENGL's failure to supply 31,000 barrels of raw make per day to the Plant, and its refusal to commit to supply that amount, constituted a violation of the ROA and the RJA; (b) the respective transferors (TOC, Tennessee, and EGP) in each of the three transfers at issue in this case breached section 12.2 of the ROA, by failing to secure the agreement of their respective transferees (TNGL, EGP, and OLP) to supply 31,000 barrels of raw make to the Plant per day; and (c) the Second Transfer in particular constituted a breach of the ROA for a second independent reason—namely, that the transferor, Tennessee, failed to comply with section 12.5 of the ROA.

Appellants also asserted (a) that ENGL had breached a fiduciary duty to Enterprise as a fellow partner in MBA by refusing to recognize its obligation to supply raw make to the Plant pursuant to the terms of the ROA and the RJA; and (b) that both TOC and ENGL had breached that same fiduciary duty by "transferring the partnership interest [in MBA] to the detriment of the partnership." Appellants also asserted one more claim for breach of fiduciary duty, based on the sale of the Dean Products pipeline (*see* note 6, *supra*)—which, appellants alleged, "stripp[ed] away from TNGL its major source of raw make[.]"

Finally, appellants asserted that Enron Corp. had tortiously interfered with appellants' contractual rights under the ROA and the RJA by inducing or participating with Tenneco Inc., TOC, and Tennessee in a scheme to avoid appellants' rights under sections 12.2 and 12.5 of the ROA.

11. According to the allegations of plaintiffs' original petition, the First Transfer took place in two stages. Plaintiffs asserted that TOC transferred 99.8 percent of its interest in March 1989, then transferred the remaining 0.2 percent in August 1990. The evident purpose of employing that two-stage procedure was to avoid causing a termination of the MBA partnership for federal income tax purposes. *See* note 16, *infra*. For reasons not apparent from the briefs or the record, appellants dropped the allegation about the August 1990 transfer from their first and second amended petitions. Evidently, either that change was overlooked in the drafting of the

tion between [TOC] and [TNGL]." Subsequently, the trial court granted the Tenneco Defendants' first motion for summary judgment, on "all of plaintiffs' causes of action that relate to or arise from the 1991 acquisition of the stock of TNGL by EGP or any subsequent transaction." This appeal followed.

■ Under TEX.R.CIV.P. 166a(c) a summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972); *Rogers v. R.J. Reynolds Tobacco Co.*, 761 S.W.2d 788, 793–94 (Tex.App.—Beaumont 1988, writ denied). In a summary judgment proceeding, the burden of proof is on the movant, and all doubts about the existence of a genuine issue of fact are resolved against the movant. *Roskey v. Texas Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex.1982); *Rogers*, 761 S.W.2d at 795. Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. The nonmovant then must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); *United Business Mach. v. Entertainment Mktg., Inc.*, 792 S.W.2d 262, 264 (Tex.App.—Houston [1st Dist.] 1990, no writ).

■ In reviewing the granting of a motion for summary judgment, this Court will take all evidence favorable to the nonmovant as true. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex1986); *Goldberg v. United States Shoe Corp.*, 775 S.W.2d 751, 752 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Every reasonable inference will be indulged in favor of the nonmovant, and any reasonable doubt will be resolved in his favor. *Continental Casing Corp. v. Samedan Oil Corp.*, 751 S.W.2d 499, 501 (Tex.1988); *Goldberg*, 775 S.W.2d at 752. The movant has the burden of showing that there are no genuine issues of material fact, and that he is entitled

to judgment as a matter of law. *MMP*, 710 S.W.2d at 60; *Goldberg*, 775 S.W.2d at 752.

■ A summary judgment cannot be affirmed on any grounds not presented in the motion for summary judgment. *Hall v. Harris County Water Control and Improvement Dist. No 50*, 683 S.W.2d 863, 867 (Tex.App.—Houston [14th Dist.] 1984, no writ).

■ When a trial court's order does not specify the grounds relied on for its ruling, the summary judgment will be affirmed if any of the theories advanced are meritorious. *Insurance Co. of North America v. Security Ins. Co.*, 790 S.W.2d 407, 410 (Tex.App.—Houston [1st Dist.] 1990, no writ).

■ Summary judgment is proper for a defendant if his summary judgment proof establishes, as a matter of law, that there exists no genuine issue of material fact concerning one or more of the essential elements of the plaintiff's cause of action. *Goldberg*, 775 S.W.2d at 752.

■ Issues not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment cannot be considered on appeal as grounds for reversal. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d at 676.

In three points of error, appellants contend that each of the summary judgments is erroneous, both because the trial court's interpretation of the Restated Operating Agreement is incorrect as a matter of law, and because genuine issues of material fact remain.

We turn first to the Enron Defendants' motion for summary judgment and the Tenneco Defendants' substantively identical first motion for summary judgment. Each presented the same single basis for summary judgment, and relied upon the same summary judgment evidence, which the respective movants asserted entitled them to summary judgment on *all* contract and tort claims against them arising from the Second and Third Transfers; neither motion presented any *separate* basis for summary judg-

---

order granting the Tenneco Defendants' second motion for summary judgment, or that change

was itself an oversight during the amendment of the petition.

ment on appellants' tort claims.[12] Appellees presented that single, all-inclusive basis for summary judgment as follows. Appellees (a) directed the trial court's attention to section 12.5 of the ROA, setting forth TNGL's co-owners' preferential right—which, by its express terms, was to be triggered by a prospective transfer of all or part of *an ownership interest* in the Plant; then (b) asserted that each of those two transfers was strictly a purchase and sale of the stock of TNGL, and presented summary judgment evidence in support; then (c) cited authority to the effect that the transfer of stock of a corporation does not constitute a transfer of title to any property belonging to the corporation; and concluded from these premises that (d) neither the second nor the Third Transfer constituted a transfer of the ownership interest in the Plant that TNGL held at the time of those sales; and, in turn, that neither transfer triggered the preferential right set forth in section 12.5.

■ Appellants attack the sufficiency of appellees' summary judgment evidence with respect to the Second Transfer. Appellants contend that a genuine issue of material fact remains concerning whether the Second Transfer at issue here was, in its true nature, "an asset sale disguised as a stock sale."

The Enron Defendants presented the affidavit of Enron Corp.'s vice president of corporate development, in which he attested that he was familiar with both the Second and Third Transfers, and that each was a stock purchase in which the buyer "did not separately acquire any ... assets" of the corporation. Appellants presented, in response, summary judgment evidence consisting of (1) deposition excerpts and documentary evidence *that appellees concede* shows Tenneco Inc. had *originally* offered TNGL for sale in several asset packages, before the form of the transaction was finalized; (2) a press release announcing a "definitive agreement" for that transaction between Tenneco Inc. and Enron Corp., which Tenneco Inc. described as (a) the sale of its natural gas liquids business to Enron Corp. for $632 million, and also as (b) "the key element of the company's non-core business divestiture program" for the "*sale* of non-core *assets*" (emphasis added);[13] and (3) an excerpt from the deposition of the corporate representative of Tenneco Inc. and TOC, in which he stated that the Tenneco Defendants and Enron Corp. elected "to treat the sale for tax purposes as if it had been an asset sale as opposed to a sale of stock, as it legally was." The Enron Defendants' reply to appellants' response included only argument, not additional summary judgment evidence.

The record does not include a copy of any written agreement for the Second Transfer. It is unreasonable to infer that a $632 million transaction, whatever its form, was made without a written agreement. Appellees, as movants, had the burden to show that the Second Transfer was a stock sale. In the absence of a copy of the agreement, appellants' summary judgment evidence was sufficient to raise a genuine issue of material fact

---

**12.** In their motion for summary judgment, the Enron Defendants did not address appellants' tort claims, beyond a single assertion that "[t]he liability of all the Enron Defendants is dependent on a breach of [the 'consent provisions'], whether called breach of contract, breach of fiduciary duty, or tortious interference." In their response to the Enron Defendants' motion, appellants argued that their tort claims "are separate from the contract claims and raise separate fact issues which are not ripe for summary judgment." The Enron Defendants replied to that argument by maintaining their original position; they said, "Because of the legal rule that an acquisition of stock is not a 'transfer' which triggers consent provisions, the Enron Defendants did not breach any agreement, tortiously interfere with one, or breach any fiduciary duty allegedly owed to [appellants]."

Similarly, the Tenneco Defendants' motion for summary judgment said only that "[t]he liability of the Tenneco Defendants is dependent on a breach of [the 'consent provisions'], whether called breach of contract or breach of fiduciary duty." In their response, appellants argued that their tort claims were "not dependent upon their contract claims." The Tenneco Defendants did not reply to that response.

**13.** Appellants also presented a draft press release from Enron Corp. concerning the transaction; that draft, however, refers to EGP's imminent acquisition of the *stock* of TNGL, and nowhere refers to the transaction as a sale or purchase of *assets*.

concerning whether the Second Transfer was an asset sale rather than a stock sale.

The summary judgment for appellees on appellants' claims against them arising from the Second Transfer was error.

■ Appellants do not attack the sufficiency of appellees' summary judgment evidence with respect to the Third Transfer. Instead, appellants contend that they were given insufficient opportunity for discovery before the summary judgment with respect to the Third Transfer was granted. We agree.

On February 9, 1993, appellants served on appellees their second amended petition, which was the first time they complained of the Third Transfer. The Enron Defendants served their motion for summary judgment on appellants on Friday, April 30, 1993, by certified mail. Rule 166a(c) of the Texas Rules of Civil Procedure mandates that a motion for summary judgment be filed and served at least 21 days before the time specified for hearing. Because service was by mail, rule 21a mandates that three days be added to that prescribed period. The 24th day after April 30, 1993, was Monday, May 24, 1993; the order granting summary judgment was signed on the very next day.

Insofar as the portion of the record to which the parties have directed us reveals, appellants first learned of the existence of OLP and the MLP[14] at or near the time of the deposition of a vice-president of Enron Corp. on January 28, 1993. After the fifth question appellants' counsel asked about the MLP, opposing counsel interposed a relevance objection and instructed the witness not to answer any questions about the MLP. The participants engaged in some additional exchange about the MLP; then, during a break in the deposition, the relationship of the OLP to the MLP was discussed. When the deposition resumed, opposing counsel again objected, based on relevance, to questions about the OLP and/or the MLP, and instructed the witness not to answer. To that extent, the Enron Defendants refused to allow discovery about the Third Transfer. In their response to the Enron Defendants' motion for summary judgment, appellants complained that summary judgment was improper because the Enron Defendants were resisting discovery concerning the details of the Third Transfer. Appellants' response was sufficient to "expressly present" the issue to the trial court within the meaning of Tex.R.Civ.P. 166a(c). In their reply to appellants' response, the Enron Defendants did not refute appellants' contention that they had improperly been denied the opportunity for discovery about the Third Transfer.

■ Rule 166a(c) clearly contemplates that the trial court must allow a reasonable opportunity for discovery before granting a summary judgment. The purpose of discovery is to allow a party to garner relevant facts pertaining to its claim or defense, and the rules governing discovery should be liberally construed. *See Martinez v. Rutledge,* 592 S.W.2d 398, 399 (Tex.Civ.App.—Dallas 1989, writ ref'd n.r.e.).

The summary judgment here was granted just under four months after appellants first learned of the Third Transfer—which was three months and 15 days after appellants first filed suit concerning that transfer. It appears that the question of whether a stock sale triggers a right of first refusal was then, and still is, a question of first impression in Texas.[15] The other evidence in the record supports the conclusion that more of an opportunity to discover facts should have been afforded; appellants' evidence raising a fact issue concerning whether the Second Transfer was indeed unequivocally a stock sale and not an asset sale indicates that, given more time, appellants might have raised a fact

---

14. *See* note 8, *supra.*

15. Although this same question was also presented, as here, in the context of an appeal from a summary judgment in favor of the defendant, in *Galveston Terminals v. Tenneco Oil Co.,* 904 S.W.2d 787 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.) (op. on reh'g), we did not reach the question in that case. There, another panel of this Court reversed that summary judgment for the same reason that underlies our disposition of this case with respect to the Second Transfer; in *Galveston Terminals,* a "critical component" of the transaction—a particular contract between the defendant and its vendee—was not part of the summary judgment record. 904 S.W.2d at 792.

issue concerning the true nature of the Third Transfer.

We recognize that in *National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517 (1995), the supreme court reversed a decision of this court which relied on this same reasoning. In *National Union*, the supreme court held that this Court erred in holding that the plaintiff, CBI, was entitled to an opportunity to discover "parol evidence going to the parties' intentions in order to create a latent ambiguity" in the insurance contract between them. 907 S.W.2d at 520–21. In that decision, the reasoning on which we rely here was not repudiated by the supreme court; instead, the court repudiated only the application of that reasoning to the particular additional discovery the plaintiff there sought. Our decision here is not in conflict with *National Union*.

We conclude that the summary judgment on appellants' claims against them arising from the Third Transfer was error.

Next, we turn to the Tenneco Defendants' second motion for summary judgment, relating to the First Transfer. In that motion, they presented three bases on which they contended that they were entitled to judgment as a matter of law on all claims related to or arising from that transfer. Like their first motion for summary judgment, this second motion did not separately address appellants' tort claims, or present any separate basis for summary judgment on those claims alone. We consider, in turn, each of the three bases presented.

■ First, the Tenneco Defendants asserted that section 12.2 of the ROA does not apply to affiliate transfers. They reasoned that (a) by its terms, section 12.2 addresses only sales, transfers, or assignments of ownership interest "authorized by section 12.1"; (b) section 12.1 authorizes sales, transfers, assignments, or other conveyances of ownership interest only in favor of "another owner or a third party"; (c) the term "third party" as used at that point in the ROA means an *unrelated* third party; and, therefore, (d) the term "third party" excludes transfers to affiliates from the scope of section 12.1—and also, in turn, from the scope of section 12.2. We reject this argument. The ROA clearly

contemplated that transfers to affiliates would be permitted; any other construction would render superfluous the portion of section 12.6 that exempts any transfer of an ownership interest from any owner to any affiliate of that owner, from the preferential right. Additionally, had the parties intended to exclude affiliate transfers from the scope of section 12.2, we believe they would have done so straightforwardly, as they did when they wrote section 12.6 to exclude affiliate transfers from the scope of section 12.5; and not so obliquely as by omitting from section 12.1 a separate express mention of transfers to affiliates. In that light, we construe the term "third parties" in section 12.1 to be synonymous with "other entities"; the language in section 12.1 authorizing transfers to owners or to third parties (subject to the preferential right set out in section 12.5, which is itself qualified by the exemptions set forth in section 12.6) authorized transfers to owners or to any other entity, whether an affiliate of an owner, or not. Accordingly, section 12.2 applies to transfers to affiliates, and this summary judgment in favor of the Tenneco Defendants cannot be affirmed on the first basis asserted by the Tenneco Defendants.

■ Next, the Tenneco Defendants asserted that section 12.2 of the ROA "unambiguously provides that *the only consequence* of attempting a transfer without complying with section 12.2 is that the transfer will not be effective," such that the appellants had no right to damages or specific performance, the only remedies they sought. We reject this argument as well. We note, first, that the Tenneco Defendants cite no authority to support it. Moreover, the language of section 12.2 will not support the "only" portion of the Tenneco Defendants' paraphrase of section 12.2. Nothing in the language of section 12.2 evidences an intention to limit any party's remedies for breach of any provision of the ROA. Remedies provided in a contract may be permissive or exclusive, and the mere fact that an agreement provides a party with a particular remedy does not necessarily mean that such remedy is exclusive of all others. *Pelto Oil Co. v. CSX Oil & Gas Corp.*, 804 S.W.2d 583, 586 (Tex.App.—Houston [1st

Dist.] 1991, writ denied). A construction that renders the specified remedy exclusive should not be made unless the intent of the parties that it be exclusive is clearly indicated or declared. *Vandergriff Chevrolet Co. v. Forum Bank*, 613 S.W.2d 68, 70 (Tex.Civ. App.—Fort Worth 1981, no writ). We read section 12.2 to require any transferee receiving and accepting an ownership interest also to accept the delivery obligation described, and to permit the other owners the choice either to void the transfer, or to undertake to compel a recalcitrant transferee whom they believe *can do so* either to perform that delivery obligation or to respond in damages.

 Finally, the Tenneco Defendants asserted that appellants had waived and/or were estopped from demanding their compliance with section 12.2 in connection with the First Transfer. The Tenneco Defendants direct our attention, first, to an exchange of correspondence which, they assert, shows that Enterprise, in its own words, " 'acknowledged' the transfer in writing and confirmed in writing that the transfer was effective" and valid and of binding force. That exchange of correspondence does not establish as a matter of law the truth of the Tenneco Defendants' assertion.[16]

The Tenneco Defendants also rely on summary judgment evidence that appellants knew of the First Transfer at or near the time it took place; and on other summary judgment evidence consisting of excerpts from the depositions of five persons employed by various appellants, which they read as indicating that (a) those employees knew that TNGL did not execute "an agreement with [Enterprise] to put through the [Plant] a volume of raw make per day at least equal to the volume [31,000 barrels] set forth" opposite TNGL's name in Exhibit A to the RJA; and (b) those employees knew from the date of the First Transfer onward that TNGL was delivering "substantially less than 31,000 barrels per day[.]" Two of those deposition excerpts do not sufficiently conform to the Tenneco Defendants' readings to support their position. Roth, the designated corporate representative of Enterprise, testified as follows:

Q: There is an allegation that [TOC] failed to require [TNGL] to enter into an agreement with Enterprise for the delivery of 31,000 barrels of raw make a day as it was required to do. As I understand what we've just talked about here, Enterprise made an election not to enforce that provision [section 12.2] of the [ROA]; is that correct?

A: I think it's correct to say that at that time they chose not to do it, yes.

McKinley, *the designated corporate representative of TEPI, testified as follows:*

Q: And with knowledge that Tenneco was averaging, we see in 1990, 17,000 barrels a day, and we saw in 1989, I think 16.4—16,400 barrels a day. With that knowledge that that was the range of

---

**16.** According to the faces of those letters, on June 21, 1990, Judy Gechman, an attorney apparently representing TOC, wrote to Michael R. Johnson of Enterprise, asking him to sign a copy of her letter and return it, to confirm certain facts evidently germane to whether the First Transfer would cause a termination of the MBA partnership for tax purposes. Gechman said that in 1989, TOC had transferred 99.8 percent of its 50 percent interest in MBA to TNGL, and that TOC "now wishes to transfer" the remaining 0.2 percent of its 50 percent interest in MBA to TNGL in accordance with section 9.5 of the MBA Partnership Agreement. Then, after describing the requirement of section 9.5 that the conveyance not cause a termination of the MBA partnership for federal income tax purposes, she went on to set out the facts she wished Enterprise to confirm:

TOC has not transferred any of its interest in the partnership in the past 12 months and has determined that its actions alone will not cause a termination of the partnership. Additionally, you have represented that [Enterprise] has not conveyed any part of its interest in the partnership and that Enterprise will not make any transfer of its ownership interest in the partnership during the 12 months following the transfer by TOC which, when combined with the transfer by TOC described above, would equal more than a 49.9 percent interest in the partnership.

Charles Roth, Executive Vice President of Enterprise, signed a copy of Gechman's letter. On June 25, 1990, Johnson replied to Gechman, enclosing the copy of Gechman's letter Roth had signed; the body of Johnson's letter said, in full, "Enclosed herein is the letter you sent to me on June 21, 1990 acknowledging transfer of interest from [TOC] to [TNGL]."

**456**

the Tenneco deliveries, you accepted [TNGL] as the joint owner in the [Plant], correct?

A: Correct. If you have no reason to doubt their good faith in meeting the obligations under [section] 5.4, then the fact that that's the volume is fine.

Together, the foregoing deposition excerpts raise a fact issue about whether the appellants chose to accept less than 31,000 barrels per day from TNGL as a temporary circumstance forced upon them all because TNGL in good faith was unable to obtain and supply the full amount at that time. Additionally, the Tenneco Defendants failed to provide the trial court with summary judgment evidence to show that they had changed position to their detriment in reliance upon appellants' omission to enforce their right to receive a full 31,000 barrels per day from TNGL. Accordingly, the Tenneco Defendants failed to establish as a matter of law that appellants' conduct either constituted a waiver—*i.e.,* an intentional relinquishment of a known right, or intentional conduct inconsistent with claiming that right [17]—rather than a response to circumstances beyond their ability to change or control; or estopped them from subsequently enforcing their right to receive a full 31,000 barrels per day from TNGL. *See Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765 (Tex.App.—Texarkana 1992, writ denied) (there can be no waiver unless so intended by one party and so understood by the other); *Thate v. Texas & Pac. Ry. Co.,* 595 S.W.2d 591, 595–96 (Tex.App.—Dallas 1980, writ dism'd) (equitable estoppel ordinarily requires a showing of detrimental reliance by the party asserting the theory).

None of the three bases presented in the Tenneco Defendants' second motion for summary judgment will support the summary judgment rendered in their favor relating to the First Transfer.

We sustain appellants' points of error one through three, to the extent they concern whether genuine issues of material fact remain and preclude summary judgment. We do not reach, and express no opinion on,

appellants' legal argument that the trial court's interpretation that article 12 of the ROA does not apply to stock sales is incorrect as a matter of law.

We reverse the summary judgments in their entirety, and we remand the case for trial on appellants' claims.

---

17. *Sun Exploration and Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987).